UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**AROMANDO, LIGHT & CROFT, LLC**
195 Fairfield Avenue - Suite 4D
West Caldwell, New Jersey 07006
973-403-9100
Benjamin D. Light, Esq.
Federal Bar No.: BDL 7774

| | |
|---|---|
| DEMODULATION, INC.<br><br>Plaintiff,<br><br>vs.<br><br>APPLIED DNA SCIENCES, INC., CORNING INCORPORATED., ALFRED UNIVERSITY, ALFRED TECHNOLOGY RESOURCES, INC., JOHN AND JANE DOES 1-10 (fictitious names for individuals whose identities are not yet known), and XYZ CORPORATIONS 1-10 (fictitious names for corporations whose identities are not yet known),<br><br>Defendants. | CIVIL ACTION NO:<br><br><br><br>**COMPLAINT** |

1. Demodulation, Inc. ("DEMOD" or "plaintiff") is a Delaware corporation with its principal place of business at 121 Goodwin Terrace, Westwood, New Jersey.

2. DEMOD is the sole successor in interest to all the rights and liabilities of Demodulation, L.L.C., a New Jersey limited liability company.

3. Defendant Applied DNA Sciences, Inc. ("ADNAS") is a Nevada corporation of the State of New York with its principal place of business at 25 Health Sciences Drive, Suite 113 Stony Brook, New York.

4. Defendant Corning Incorporated is a corporation with its principal place of business at One Riverfront Plaza, Corning, New York.

5. Defendant Alfred University is a private university with its principal place of business in Alfred, New York.

6. Defendant Alfred Technology Resources, Inc. is registered as a non-profit corporation of the State of New York with its principal place of business at 200 North Main Street, Alfred, New York.

## JURISDICTION AND VENUE

7. Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  Plaintiff is a resident of the State of New Jersey while all of the defendants are residents of a state other than New Jersey.  The amount in controversy exceeds $75,000.  Pendant jurisdiction of state law claims is conferred by 28 U.S.C. § 1367.

8. Venue is proper in this court pursuant to 28 U.S.C. § 1391 (b)(1) and 18 U.S.C. § 1965.

**COMMON FACTUAL ALLEGATIONS**

9. DEMOD has attempted to bring its technology to market but has been prevented from doing so by the wrongful acts of the Defendants named above, persons and corporations whose identities are presently not know to DEMOD. The Defendants have conspired to steal DEMOD's trade secrets and other intellectual property (collectively, "trade secrets") and to otherwise interfere in DEMOD's business opportunities. Due to the wrongful acts alleged herein, DEMOD has been severely damaged.

10. The DEMOD trade secrets at issue revolve around glass covered amorphous metal microwires ("microwire"). DEMOD's trade secrets concern, among other things, several specific methods and systems for detecting and reading these microwires at both short range and long distances, including various means to modify and/or configure the microwire to elicit the desired performance. In order to manufacture microwire products having the appropriate behaviors and properties, highly engineered combinations of materials are selected and processed to achieve a composite structure; each structure or configuration will yield a

unique magnetic structure which, in turn, defines the electromagnetic behavior needed for a given application.

11. Microwire has truly amazing properties which have myriad applications in the homeland security, defense, article tracking, energy and other industries. The United States Department of Energy, through its laboratory at Oak Ridge, Tennessee, has thoroughly evaluated DEMOD's trade secrets and reached the following conclusions: tension on the microwire alters the response from the microwire making it suitable for "temperature, pressure, chemical and biological sensing"; the microwire's response is altered by its angular relation to an alternating magnetic field making it suitable for a "pitch, yaw and roll" sensor; a break in the microwire can be detected making it suitable for tamper indication; the microwire can detect tension when deployed in nonferrous material; "Microwires appear to have unique signatures, similar to differences among fingerprints or snowflakes. These signatures can be modified by incorporating minute magnetic material at different locations along the length of the microwire. In addition, if localized stress variations along the length are incorporated, these, too, change the signature. This experiment validated the belief that an encoding method is feasible and supports Demodulation's encoding patents  The

unique signature and/or ability for encoding could have many benefits, including a defense for counterfeiting;" DEMOD's microwire was superior to magnetic strips found on credit cards and other items because microwire is practically invisible and never wears out, unlike the magnetic strips; DEMOD's microwire was an "excellent candidate" for *in-situ* sensors and there is a robust market with "few competing products" "available for exploitation;" microwire was well suited for detection of particular "gas, pressure, temperature, humidity;" If microwire were attached to a seal, a broken seal would be identified; the glass coating on a microwire may be "coated with a substance that will react when attacked by a chemical or biological agent;"

12. DEMOD recognized these applications and initially sought to exploit them in the government and commercial markets by teaming with Alfred University.

13. DEMOD and Alfred signed an agreement whereby, among other things, Alfred was granted a one percent (1%) royalty on DEMOD's gross sales of commercial products in exchange for Alfred's endeavoring to gain state, federal and private funding for the advancement security-related applications of DEMOD's technology and intellectual property.

14. Pursuant to this agreement, DEMOD took up residence at Ceramic Corridor Innovation Center ("CCIC") at Alfred, New York. CCIC was and is managed by Alfred Technology Resources, Inc. ("ATRI") which is a non-profit corporation jointly formed and operated by Alfred and Corning Corporation. Robert Ecklin, an Executive Vice President at Corning and a member of the board of the SUNY-Research Foundation and Chair of its Audit Committee, was also Chairman of ATRI. CCIC was established to gather and disburse funds and other assets to companies like DEMOD for the development of ceramics-related technologies.

15. DEMOD executed non-disclosure agreements with Alfred, ATRI and Corning.

16. After DEMOD established its relationship with Corning, Alfred, ATRI and CCIC, Corning met with representatives of Advanced Coding Systems, an alien corporation and a competitor of DEMOD's at that time. Corning never disclosed its meeting with ACS and DEMOD only learned of it years later.

17. Corning had invested approximately $800,000,000 to purchase a company called Intellisense which produced technology that competed with DEMOD. Intellisense focused on Micro Electro Mechanical Systems ("MEMS") devices which have applications in the areas of wireless sensors, radio

frequency devices and other areas where microwire is considered a superior, competing technology.  Without disclosing this conflict of interest, and while operating ATRI, Corning proceeded to actively interfere with DEMOD's business and other proprietary interests.

18. By way of example and not limitation, Corning ensured that DEMOD received no federal or state funding that was earmarked for technologies such as DEMOD's.  Corning's former CEO, Mr. Amory Houghton, was elected to the United States House of Representatives and his office wrote the policies for the National Institute for Standards and Technology ("NIST").  Amory Houghton's brother was the CEO of Corning at the time.  DEMOD applied for a grant from NIST and was flatly rejected with harsh non-sensical criticism from the NIST reviewer.  At the same time, Corning Corporation received at least $8,000,000 in grants from NIST.

19. Robert Ecklin served on the SUNY-Research Foundation with Dr. James Hayward, the CEO of ADNAS, defendant herein. Mr. Ecklin and Dr. Hayward ensured that DEMOD received no grants or assistance from the SUNY-RF but that ADNAS did. Corning and Ecklin provided ADNAS and Hayward proprietary information concerning DEMOD's microwire's characteristics

and specifications and its methods for encoding and detecting the microwire.

20. Mr. Ecklin publicly defamed DEMOD at a meeting of government representatives attended by then State Representative George Winner, James Guccinski of NAVSEA Crane (Naval research organization), A.J. Colletti of the New York State Office of Disaster Preparedness and Response, Dr. William LaCourse of Alfred, Bill Heaney of then Governor Pataki's office and others. These actions By Mr. Ecklin were in direct contradiction to his duties to DEMOD arising from Corning's operation of ATRI and the CCIC.

21. Corning interfered in DEMOD's negotiation with In-Q-Tel Corporation. Corning Board member John Seeley Brown was also a Board member of In-Q-Tel. Mr. Brown, while acting in his capacity as board member of Corning, directed that In-Q-Tel cease all negotiations with DEMOD despite intense interest from other In-Q-Tel representatives. DEMOD was introduced to In-Q-Tel by employees of the Central Intelligence Agency. Subsequently, in late 2010 after Brown retired from his position at in-Q-Tel, In-Q-Tel inquired whether DEMOD would be interested in exploring the same opportunities that existed in the first attempted negotiation that Brown quashed.

22. Shawn Hogan, then mayor of Hornell, New York, whose daughter worked for Corning, told DEMOD that Corning employee Tom Trantor had stated to him and others that DEMOD has stolen its technology from Corning. This false statement and others like it, when combined with Corning's massive government and commercial influence, caused DEMOD's reputation to be completely ruined.

23. DEMOD sought state funding through avenues other than its Agreement with Alfred. DEMOD met with the Empire State Development Corporation ("ESDC") to seek funding. DEMOD provided confidential intellectual property and trade secrets to ESDC in order to discuss its technology and applications. One of the applications discussed and disclosed was DEMOD's then patent pending combination of DNA technology with microwire. Charles Gargano was, at the time, the Chairman of ESDC and a shareholder in ADNAS.

24. ESDC refused to provide any grant money or other assistance to DEMOD but rather referred DEMOD to Northrop Grumman as a potential partner. At the time, Northrop was a partner with Corning in one or more ventures and senior Northrop executives assigned to evaluate DEMOD's technology were former staffers of Congressman Amory Houghton's. In other words, Northrop's alleged interest was a sham and resulted in nothing of benefit to DEMOD. Erkie Kailbourne

told DEMOD that Gargano and Corning conspired to blackball DEMOD because they are working in competing areas.

25. At the time DEMOD sought funding from ESDC, ESDC was a shareholder in Intellicheck, a competitor of DEMOD's. Thus, ESDC and Gargano chose not to invest in DEMOD because of their interests in DEMOD competitors.

26. At the same time, ADNAS, with its agents well placed on the bodies that distribute state and government grants and loans in New York, received such funding and more. It was relocated to the Long Island High Technology Incubator ("LIHTI"), which is government funded.

27. ADNAS formed a partnership with Brookhaven National Labarotary, a United States Department of Energy facility operated by Brookhaven Science Associates, and secured military and other contracts for its products.

28. When DEMOD learned that ADNAS was pursuing DEMOD's trade secret concerning a combination of microwire and DNA related technology, DEMOD approached ADNAS to explore a licensing agreement or other business relationship. ADNAS' CEO informed DEMOD that it could not do business with DEMOD because he was directed to do business with an alien corporation that was producing microwire outside of the United States.

29. ADNAS' CEO stated that it received this directive from "an individual from New York." Soon after he made that statement, he was replaced by Dr. James Hayward as CEO of ADNAS who served as a consultant to ADNAS before becoming its CEO. In other words, once Hayward arranged to have ADNAS installed at LIHTI, he installed himself as CEO and began doing business with an alien corporation rather than DEMOD. This was made possible by the wrongful disclosure of DEMOD's trade secrets by the defendants.

30. DEMOD filed formal complaints with the SUNY General Counsel, the New York Inspector General's office, the New York State Comptroller's Office, the Attorney General of the State of New York and federal authorities at the Department of Justice.

31. In December of 2010, Gregory Statiuk, an investigator for the New York State Attorney General, recommended that a formal investigation be launched into the allegations made by DEMOD.

## COUNT ONE

(BREACH OF CONTRACT AGAINST ALFRED)

32. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

33. DEMOD entered into a written agreement with Alfred to facilitate the advancement of DEMOD's microwire and related technology for security-related applications. Robert Bitting executed the Agreement on behalf of ALFRED. Pursuant to the agreement, ALFRED agreed to pursue state and federal grants to conduct work on DEMOD's microwire and related technology. DEMOD agreed to give ALFRED a one percent (1%) royalty on sales and to allow ALFRED to perform certain research on the microwire. The agreement also contained terms requiring ALFRED to keep confidential all information disclosed in the course of the relationship along with other specific terms.

34. ALFRED breached this agreement by failing to pursue state, federal and other funding for DEMOD and by in fact assuring that DEMOD did not receive any such funding.

35. Specifically, the only application for funding that ALFRED made in connection with DEMOD was to NYSTAR. In that application, ALFRED intentionally misrepresented that DEMOD had made a $500,000 cash contribution in order to gain funding from NYSTAR.

36. Further, as described in Count Five, ALFRED misdirected $3-$5 million dollars from its Biomaterials

Center.  This money would have been used to develop DEMOD's trade secrets.  This misdirection of funds was a breach of the contract between ALFRED and DEMOD in addition to a fraudulent use of dedicated state and federal money.

37. ALFRED further breached the agreement by disclosing to CORNING and others information required to be kept confidential per the agreement.

38. DEMOD was damaged by Alfred's breach of contract in that DEMOD was relying upon Alfred's performance to seek in good faith funding from government and other entities to create a manufacturing facility.  Due to the lack of funding and Alfred's dissemination of confidential information, DEMOD was prevented from establishing its business as a going concern towards which DEMOD had expended millions of dollars of funds.

## COUNT TWO

(BREACH OF CONTRACT AGAINST ATRI)

39. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

40. DEMOD entered a contract with ATRI pursuant to which DEMOD took up residence and conducted its business operations at the CCIC.

41. The CCIC was a New York state funded initiative to encourage and support private companies working in the field of ceramics.

42. ATRI breached the contract by failing to seek funding for DEMOD's operations and by providing DEMOD's trade secrets to CORNING. Contrary to its duties under the contract, ATRI disseminated false information about DEMOD and ensured that DEMOD did not receive any available funding.

43. ATRI lured DEMOD into the CCIC under false pretenses for the purpose of extracting information from DEMOD.

44. DEMOD was damaged by ATRI's breach of contract in that DEMOD's technology and proprietary information was shared by ATRI with Corning and others. This dissemination of proprietary information harmed DEMOD because once the information was disseminated, DEMOD's potential business partners and customers already were in possession of the information and technology DEMOD was trying to market to those partners and customers giving them no incentive to deal with DEMOD.

## COUNT THREE

(BREACH OF CONTRACT AGAINST CORNING)

45. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

46. DEMOD entered one or more contracts with Corning requiring CORNING to keep confidential all information concerning DEMOD and its technology.

47. CORNING breached the contract by sharing DEMOD's information with others, including a foreign company producing microwire overseas.

48. Corning further breached the contract by attempting to reverse engineer DEMOD's trade secrets and sharing the results of that reverse engineering with others, including but not limited to the overseas manufacturer of microwire.

49. CORNING further breached the contract by actively undermining DEMOD by spreading false information about DEMOD, its technology and other intellectual property. By way of specific example and not limitation, Corning, through its employees or other agents including Robert Ecklin, stated that Corning was the true owner of DEMOD's technology and that DEMOD had stolen the technology from Corning.

50. According to information provided to DEMOD by Erkie Kailbourne, Corning used its political and commercial influence to ensure that DEMOD's technology and proprietary information would not find funding, an interested partner,

lender or customer in New York State. By way of example and not limitation, Corning ensured that DEMOD did not receive a grant from NIST while Corning did receive such a grant.

51. DEMOD was damaged by Corning's breach of contract in that it was prevented from bringing its technology to market, which market is in excess of $500,000,000 annually.

### COUNT FOUR

(DEFAMATION AGAINST CORNING)

52. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

53. ECKLIN was on the board of directors of SUNY-Research Foundation ("SUNY-RF") while at the same time serving as Executive Vice President of CORNING and the Director of the CCIC.

54. While serving in this capacity, Ecklin made the statements described above in paragraph 29.

55. DEMOD was damaged by these statements in that its ownership of its technology was called into doubt making those that heard Ecklin's statement unwilling to do business with DEMOD

## COUNT EIGHT

(CIVIL RICO - §1962(c) AGAINST CORNING, ALFRED, ADNAS and JANE AND JOHN DOES 1-50 and XYZ CORPORATIONS 1-50)

56. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

57. Plaintiff was damaged by a conspiracy between Corning ADNAS, Alfred and others to secure federal and state subsidies for their own benefit. Corning and Alfred formed an enterprise through ATRI to defraud the public by using public grant and loan money dedicated to the creation of jobs for their own benefit.

58. ATRI had an existence and purpose separate and apart from these defendants' use of ATRI as an enterprise. Specifically, ATRI has been given the responsibility for managing and operating the CCIC, located in Alfred, New York.

59. Mail and electronic communications were used by these defendants in furtherance of their scheme which continues to date.

60. The defendants transmitted false information by use of the mail or wires when they supplied written information to NYSTAR claiming that DEMOD had contributed $500,000 in cash towards research and development.

61. ATRI presently lists DEMOD as a successful "graduate" of the CCIC. This representation is false and is continually being transmitted by use of the wires, specifically, the internet.

62. ADNAS received state and federal money provided by NYSTAR and other entities as a result of the RICO conspiracy between these defendants. ADNAS also received its facilities and LIHTI as a result of the conspiracy.

63. Plaintiff was damaged by the RICO conspiracy and by the predicate acts taken in furtherance thereof

## COUNT NINE

(MISAPPROPRIATION OF TRADE SECRETS AGAINST CORNING, ALFRED, ATRI)

64. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

65. These defendants each misappropriated Plainitiff's trade secrets and gave them to others not entitled to receive them.

66. DEMOD was damaged thereby.

## COUNT TEN

(TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS AGAINST CORNING, ALFRED, ATRI and ADNAS)

67.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

68.     These Defendants each took actions to prevent DEMOD from doing business or getting grants or loans from third parties.

69.     As a result of these actions, DEMOD has been damaged.

**WHEREFORE**, Plaintiff demands judgment against each Defendant jointly, severally and/or collectively as follows:

(a)     Compensatory Damages;

(b)     Consequential and incidental damages;

(c)     Punitive Damages;

(d)     Attorneys' fees and costs of suit; and

(e)     Interest;

(f)     Treble damaged;

(f)     Awarding such other and further relief as the Court may deem equitable, proper and just.

### JURY DEMAND

Plaintiff hereby demands trial by a jury on all issues.

By: _____
Benjamin D. Light, Esq.

Dated: January 18, 2011