# EXHIBIT B

## Tamar Melamed

**מאת:** Steve Saft [ssaft@kleban-samor.com]
**נשלח:** יום חמישי 02 מאי 2002 19:18
**אל:** 'tami@danklaw.co.il'
**נושא:** FW:

Tami
Please forward this email to Yossi Bolless. It is self explanatory. Please let me know if I can assist in any other way.
Best regards,
Stephen Saft

-----Original Message-----
**From:** Psii David Floyd [mailto:psii.def@verizon.net]
**Sent:** Thursday, May 02, 2002 12:48 PM
**To:** Psii David Floyd
**Cc:** ssaft@kleban-samor.com
**Subject:**

*Dear Steven,*

*This e-mail is to advise you that Demodulation LLC, has no claim against ACS/AMT or Etron in connection with our interest in amorphous metal microwires. Additionally, we have made no offer to purchase ACS @ this time nor are their any outstanding commitments, agreements or contracts with any person within these companies. We do however have an interest in discussing potential working relationships in the future. I hope this memo is sufficient for your needs, I could not find Gideons E-mail so please forward this to him on my behalf.*

*Sincerely,*

*James O'Keefe*
*(Remote location)*

David Floyd, Director
Psi International 9202 Waterview Parkway
Rowlett, Tx 75089
214-607-0673 Voice
972-489-9900 Cell
413-828-6030 E Fax

---

Outgoing mail is certified Virus Free.
Checked by AVG anti-virus system (http://www.grisoft.com).
Version: 6.0.351 / Virus Database: 197 - Release Date: 4/19/2002

02/05/02

# EXHIBIT C

# LICENSE AGREEMENT

This License Agreement (AGREEMENT) is entered into between the National Institute of Research and Development for Technical Physics (NIRDTP), a Romanian institution, hereinafter referred to as LICENSOR, having its location in Iasi, Romania, and Demodulation, LLC (DEMODULATION), a corporation of the State of New Jersey, having its principal place of business at 121 Goodwin Terrace, Westwood, NJ 07675, hereinafter referred to as LICENSEE, as of the date of execution of the last PARTY hereto.

WITNESSETH:

WHEREAS, LICENSOR is the assignee of United States and of foreign patents, patent applications, and patent publications (PATENT DOCUMENTS) relating to amorphous and nanocrystalline glass-covered wires, as are summarized in APPENDIX 3; and,

WHEREAS, LICENSEE, in consideration of the grant of a license under these same PATENT DOCUMENTS, will pay royalties, make all necessary capital investments, and achieve PRACTICAL APPLICATION of the invention; and,

WHEREAS, LICENSOR has determined that the granting of a license to LICENSEE under these same PATENT DOCUMENTS, will provide the necessary incentive for LICENSEE to achieve the desired early PRACTICAL APPLICATION of the invention and the granting of such license to LICENSEE will therefore be in the public interest;

NOW, THEREFORE, in consideration of the foregoing and of the terms hereinafter contained in this AGREEMENT, the LICENSOR and LICENSEE agree as set forth below:

## ARTICLE 1
### Definitions

"PATENT DOCUMENTS" shall pertain to various documents including but not limited to issued patents, patent applications, and patent publications.

"ACCOUNTING PERIOD" shall mean the period for which royalties are calculated. For this AGREEMENT, the period is every six months.

"BREACH" shall mean (a) a violation or nonperformance by a PARTY of a MATERIAL term, condition, covenant or warranty herein, or (b) a misrepresentation made hereunder or (c) a misrepresentation by LICENSEE to induce LICENSOR to enter into this AGREEMENT (also see "MATERIAL").

"BREACHING PARTY" shall mean the PARTY in BREACH, as used in Section 8.2.

"GROSS SALES" shall mean either the total amount invoiced by or for LICENSEE, and, in the event that some or all of the amount invoiced by LICENSEE is in the form of non-monetary remuneration, then the equivalent dollar value sum of such remuneration, for all disposals i.e., (sales, uses, including uses by LICENSEE, leases, transfers, etc.) of ROYALTY-BASE PRODUCTS for consideration determined in, or as if in, an arm's length transaction.

"INSOLVENT" shall mean that LICENSEE has either ceased to pay its debts (which may include failure to pay royalty payments under this AGREEMENT) in the ordinary course of business or cannot pay its debts as they fall due.

"LICENSE COMMENCEMENT DATE" shall mean the date that the last PARTY has executed this AGREEMENT.

"LICENSE EXPIRATION DATE" shall mean the last day that this AGREEMENT is in effect.

"LICENSE TERM" shall mean the period of time starting with the LICENSE COMMENCEMENT DATE and ending with the LICENSE EXPIRATION DATE.

"LICENSED AREA" shall mean amorphous and nanocrystalline glass coated wires.

"LICENSED INVENTION" shall mean the invention defined by the claims of the LICENSED PATENT and as may be further limited by ARTICLE 2.

"LICENSED PATENT" shall mean the United States and foreign patents, patent applications, and patent publications, and shall include any corresponding: reissue patents; modifications of said LICENSED PATENT DOCUMENTS by means of certificates of correction or reexamination certificates; and continuation or divisional patent applications and patents (specifically excluding patent applications and patents containing new matter) derived from said LICENSED PATENT DOCUMENTS.

"MATERIAL," with respect to a particular matter (e.g., a BREACH), shall mean that the matter is shown to effect adversely (a) the rights and benefits of the other PARTY under this AGREEMENT; or (b) the ability of the other PARTY to perform its obligations hereunder; and, in either case, to such a degree that a reasonable person in the management of his or her own affairs would be more likely than not to decline to enter into this AGREEMENT in view of the matter in question.

"NET SALES" shall mean GROSS SALES, less allowances for returns and less (to the extent separately stated, and not charged to the customer or others, on the invoices): (1) regular trade and quantity discounts; (2) insurance and shipping charges from the point of origin; (3) duties, tariffs, and other customs charges; and (4) sales, use, value added, and similar taxes. In the case of a sale or other disposition of ROYALTY-BASE PRODUCTS which are transferred to a purchaser who does not deal at arm's length, or transferred or otherwise disposed of for other than monetary consideration (including allocations to LICENSEE's own beneficial use), NET SALES shall be calculated in accordance with Section 5.3 of this AGREEMENT.

"NONBREACHING PARTY" shall mean the PARTY not in BREACH, as used in Section 8.2.

"PARTY" shall mean a party to this AGREEMENT.

"PERSON" shall mean a natural person; a corporation (for profit or not-for-profit); an association; a partnership (general or limited); a joint venture; a trust; a government or political department, subdivision, or agency; or any other entity.

"PRACTICAL APPLICATION" shall mean, with respect to the LICENSED INVENTION, to reduce it to practice and to commercialize it, i.e., to manufacture it in the case of a composition or product, to practice it in the case of a process or method, or to operate it in the case of a machine or system; and, in each case, under such conditions as to establish: i) that a market for the LICENSED INVENTION has been created, and to the extent practicable, that a market has been created in the worldwide; ii) that it is being utilized; iii) that its benefits are, to the extent permitted by law or Government regulations, available to the public on reasonable terms; and iv) that market demand, at least in the United States and all applicable countries, shall be reasonably met.

"ROYALTY-BASE PRODUCTS" shall include the components of an item sold, used, leased, transferred, or otherwise disposed of by LICENSEE that is covered by or included within the LICENSED INVENTION. ROYALTY-BASE PRODUCTS include other devices and components not covered by or within the LICENSED INVENTION that LICENSEE would not have sold, used, leased, transferred, or otherwise disposed of but for the sale, use, lease, transfer, or other disposition of the LICENSED INVENTION.

"THIRD PARTIES" shall mean PERSONS other than the LICENSOR and the LICENSEE.

## ARTICLE 2
### License Grant

2.1 LICENSOR hereby grants to LICENSEE a terminable, royalty-bearing, exclusive license to practice, i.e., to make, have made, use, offer to sell, sell, transfer, or dispose of, the LICENSED INVENTION as limited to the LICENSED AREA defined in ARTICLE 1.

2.2 LICENSOR reserves an irrevocable, royalty-free right to practice and have practiced the LICENSED INVENTION.

## ARTICLE 3
### Term of License

3.1 The license granted in ARTICLE 2 will be in effect for a LICENSE TERM that is equal to the life of the PATENT DOCUMENTS from the date of its taking effect. This agreement shall be deemed to have taken effect upon the effective date set forth here and above and shall continue in effect for an initial term of twenty (20) years and thereafter, for additional, automatically renewed terms of ten (10) years each, unless terminated by Demodulation in accordance with the express provisions of this agreement.

## ARTICLE 4
### Practical Application

4.1 LICENSEE shall achieve PRACTICAL APPLICATION of the LICENSED INVENTION within twelve (12) months of the LICENSE COMMENCEMENT DATE and in accordance with the schedule set forth in the APPENDIXES 4 and 5 to this AGREEMENT and incorporated into this AGREEMENT. LICENSEE shall notify LICENSOR within 30 days of achieving PRACTIAL APPLICATION that PRACTICAL APPLICATION has been achieved. LICENSEE shall also provide evidence to verify the achievement.

4.2 LICENSEE, once PRACTICAL APPLICATION of the LICENSED INVENTION is achieved, shall thereafter maintain it throughout the LICENSE TERM.

## ARTICLE 5
### Royalty and Payment

5.1 In consideration of the license granted in ARTICLE 2, LICENSEE shall remit to LICENSOR a nonrefundable license fee in the amount of $30,000 six months after the execution of this AGREEMENT by LICENSEE.

5.2 LICENSEE agrees to pay LICENSOR a running royalty of percent 3.5% of the NET SALES of ROYALTY-BASE PRODUCTS. The running royalty shall be remitted to LICENSOR within 30 days of the end of every ACCOUNTING PERIOD, i.e., within 30 days after the first day of each January and July.

5.3 LICENSEE agrees that in the event any ROYALTY-BASE PRODUCTS shall be sold, transferred, or disposed of, to a third-party for purposes of resale in a transaction that does not represent an arm's length transaction, then the royalties to be paid under this AGREEMENT for the ROYALTY-BASE PRODUCTS shall be based upon the NET SALES of the ROYALTY-BASE PRODUCTS by the third-party, rather than upon the NET SALES of the LICENSEE. Examples of transactions that do not reflect an arm's length transaction includes sales, transfers or disposals(1) to any type of organization or individual who owns a controlling interest in LICENSEE by stock ownership or otherwise, (2) to any type of organization in which LICENSEE shall own, directly or indirectly, a controlling interest by stock ownership or otherwise, or (3) to any type of organization with which, or individual with whom, LICENSEE, its stockholders, or associated companies shall have any agreement, understanding, or arrangement (such as, among other things, an option to purchase stock, an arrangement involving a division of profits, or special rebates or allowances) without which agreement, understanding, or arrangement, prices paid by such organization or individual for the ROYALTY-BASE PRODUCTS would be higher than the NET SALES reported by LICENSEE, or if such agreement, understanding, or arrangement results in extending to such organization or individual lower prices for ROYALTY-BASE PRODUCTS than those charged to outside concerns buying similar merchandise in similar amounts and under similar conditions.

5.4 Under this AGREEMENT, ROYALTY-BASE PRODUCTS will be considered sold when invoiced, except that upon termination of the license, all shipments made on or prior to the day of such termination which have not been invoiced prior thereto shall be royalty-bearing.

5.5 Royalties shall be paid within thirty (30) days of the end of each ACCOUNTING PERIOD. Royalties shall be paid by check, denominated in United States dollars, and made payable to the National Institute of Research and Development for Technical Physics Iasi.

The check shall be mailed to LICENSOR at the following address: 47 Mangeron Boulevard, 6600 Iasi, Romania, concurrently with the report required in ARTICLE 6 of this AGREEMENT. LICENSOR's acceptance of any royalty payment does not eliminate LICENSOR's right to contest the accuracy of such payment in the future.

      5.6 LICENSOR shall assess interest, as linked to the prime United States interest rate, and penalties on all payments due LICENSOR which are not timely paid by LICENSEE.

## ARTICLE 6
## Reports

      6.1 LICENSEE shall submit to LICENSOR written reports within thirty (30) days of the end of every ACCOUNTING PERIOD whether or not royalties are due. Each report shall be submitted concurrently with the royalties required by ARTICLE 5. To ensure that any proprietary information submitted by LICENSEE is protected to the fullest extent of the law, LICENSEE should mark with a proprietary notice, any portions of the report that is considered proprietary to LICENSEE.

      6.2 Each report shall include the following information:

(a) With reference to the schedule set forth in accordance with the data presented in the Demodulation Business Plan (APPENDIXES 4 and 5 of this AGREEMENT), a narrative description of the steps being taken to reduce the LICENSED INVENTION to practice.

(b) With reference to the schedule set forth in accordance with the data presented in the Demodulation Business Plan (APPENDIXES 4 and 5 of this AGREEMENT), a narrative description of the steps being taken to create a market demand for the LICENSED INVENTION, to commercialize the LICENSED INVENTION, and to meet market demand for the LICENSED INVENTION.

(c) A narrative description of the ROYALTY-BASE PRODUCTS currently being offered for sale by LICENSEE. Copies of current sales brochures and promotional materials shall be included with this description.

(d) A list of the geographic locations at which the LICENSED INVENTION is being manufactured.

(e) The number and type of ROYALTY-BASE PRODUCTS sold or disposed of by LICENSEE.

(f) LICENSEE's GROSS SALES.

(g) LICENSEE's NET SALES.

(h) The amount of royalties due LICENSOR.

      6.3 Each report shall be accompanied by a certification by an officer of LICENSEE that the LICENSEE is complying with the terms and conditions of this AGREEMENT and that the responses to each part of Section 6.2 are accurate and complete.

      6.4 LICENSEE shall, on an annual basis, submit to LICENSOR an audited balance sheet and an audited income statement. LICENSEE will supply complete records on NET SALES, which will support the ROYALTY PAYEMENTS under Section 5.2. Internal audits are permissible, but LICENSOR reserves the right to require an independent audit and additionally reserves the right to approve of the auditor, all at the expense of LICENSOR.

      6.5 LICENSEE shall submit a final report to LICENSOR within thirty (30) days after the termination of this AGREEMENT.

# ARTICLE 7
## Audit Rights

7.1 LICENSEE shall keep full, true, and accurate records for the purpose of LICENSOR verifying LICENSEE's reports to LICENSOR under ARTICLE 6, verifying LICENSEE's royalty payments to LICENSOR under ARTICLE 5, and for determining LICENSEE's activities in general under the AGREEMENT. These records shall consist of all applicable records, including sales and use tax records.

7.2 The records described in Section 7.1 shall be available for audit by LICENSOR, or by an authorized representative of LICENSOR, at all reasonable times for the LICENSE TERM and for three (3) calendar years thereafter. In addition, LICENSEE shall permit inspection by LICENSOR, or by an authorized representative of LICENSOR, of LICENSEE's manufacturing facilities during any audit by LICENSOR.

7.3 If LICENSOR, as a result of an audit, discovers an underpayment of royalties which exceeds $10,000 then LICENSEE shall reimburse LICENSOR for the cost of the audit, including all related costs of performing the audit (e.g., travel, food, lodging, cost of professional services, etc.), in addition to any penalties assessed pursuant to Section 5.6. Errors will be adjusted accordingly for either underpayments or overpayments.

# ARTICLE 8
## Dispute or Breach

8.1 All disputes concerning the interpretation or application of this AGREEMENT shall be discussed mutually between the PARTIES. Any disputes that are not disposed of by mutual agreement shall be referred to arbitration in conformity with the rules of the States of New Jersey and New York.

8.2 In the event of a BREACH of any provision of this AGREEMENT, the NONBREACHING PARTY shall give the BREACHING PARTY notice describing the BREACH and stating that the BREACHING PARTY has thirty (30) days after notice of the BREACH to cure the BREACH or show cause why the AGREEMENT should not be terminated in accordance with Section 9.8.

8.3 If a provision of this AGREEMENT sets forth a cure period for the BREACH in question other than thirty (30) days, then that provision shall take precedence over the cure period set forth in Section 8.2.

8.4 No cure period is required, except as may be otherwise provided in this AGREEMENT, if: (a) this AGREEMENT sets forth specific deadline dates for the obligation allegedly breached; or (b) this AGREEMENT otherwise states that no cure period is required in connection with the termination in question.

8.5 The BREACHING PARTY will be deemed to have cured such BREACH if within the cure period it takes steps reasonably adequate to alleviate any damage to the NONBREACHING PARTY resulting from the BREACH and to prevent a similar future BREACH.

## ARTICLE 9
### Termination or Modification

9.1 The PARTIES may terminate or modify this AGREEMENT by mutual consent upon such terms as they may agree in writing.

9.2 Either PARTY may terminate this AGREEMENT by failing to extend the LICENSE TERM, if an extension is provided for in Section 3.1.

9.3 Either PARTY may terminate this AGREEMENT upon the discovery by one PARTY of any intentional MATERIAL false statement or misrepresentation made or submitted by the other PARTY which BREACHES any obligation under the terms of this AGREEMENT or upon the discovery by one PARTY that the other PARTY has committed a MATERIAL breach of a provision of the AGREEMENT.

9.4 LICENSEE may prospectively terminate this AGREEMENT upon ninety (90) days written notice to LICENSOR.

9.5 This AGREEMENT may be terminated by LICENSOR if:
(a) LICENSOR determines that LICENSEE has failed or will fail to achieve and maintain PRACTICAL APPLICATION of the LICENSED INVENTION as provided by Section 4.1.
(b) LICENSOR determines that LICENSEE has failed or will fail to reduce to practice the LICENSED INVENTION.
(c) LICENSEE fails to pay royalties and submit reports as provided by ARTICLES 5 and 6.

9.6 LICENSOR may terminate this AGREEMENT if LICENSEE becomes "INSOLVENT." LICENSEE must notify LICENSOR within thirty (30) days after becoming INSOLVENT. LICENSEE's failure to conform to this requirement shall be deemed a material, incurable breach.

9.7 LICENSEE must promptly inform LICENSOR of its intention to file a voluntary petition in bankruptcy or of another's communicated intention to file an involuntary petition in bankruptcy. LICENSOR may terminate this AGREEMENT upon receiving notice of intention to file. LICENSEE's filing without conforming to this requirement shall be deemed a material, pre-petition incurable breach.

9.8 Before LICENSOR unilaterally modifies, or terminates this AGREEMENT for any cause, LICENSOR will furnish LICENSEE a written notice stating LICENSOR's intention to modify or terminate the AGREEMENT and the reasons therefore. LICENSEE will be allowed thirty (30) days after: (1) such notice to remedy any BREACH of the AGREEMENT or show cause why the AGREEMENT should not be unilaterally modified or terminated; or, (2) such notice of a decision regarding a dispute, rendered in accordance with Section 8.1, to rebut such decision. A response to a notice of modification or termination or to a notice of a dispute determination should be addressed to the Administrative Board, National Institute of Research and Development for Technical Physics, Iasi, 6600, Romania. The Administrative Board will render a determination based on the LICENSEE'S response within a reasonable time. Absent any response from LICENSEE to the notice regarding the modification, termination and/or dispute determination, the determination by the Administrative Board will be final and/or the AGREEMENT will be unilaterally modified or will terminate, effective thirty-one (31) days from the notice of modification, termination or dispute determination, with no right to appeal under Section 9.9.

9.9 LICENSEE may appeal in writing to the General Director of the National Institute of Research and Development for Technical Physics, any determination rendered by the Administrative Board in accordance with Section 9.8, within thirty (30) days of notice of such determination. The notice of appeal and all supporting documentation should be addressed to the General Director, National Institute of Research and Development for Technical Physics,

Iasi, 6600, Romania. LICENSEE shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. The decision on the appeal shall be made by the General Director or designee, which shall be the final decision from which there will be no further right of administrative appeal. Nothing in this Article shall be interpreted as precluding actions at law.

9.10 If no action is taken under Section 9.9, then the decision to modify or terminate this AGREEMENT shall become final within thirty-one (31) days of the notice of determination rendered by the Administrative Board in accordance with Section 9.8.

9.11 All royalties and reports due up to and including the date of termination of this AGREEMENT are due within thirty (30) days of the date of termination.

## ARTICLE 10
### Governing Law

10.1 This AGREEMENT will be interpreted and enforced in accordance with the applicable State of New Jersey or New York law.

## ARTICLE 11
### Trademarks

11.1 LICENSEE will be the sole owner of amorphous and nanocrystalline glass coated wire TRADEMARKS, which are to be identified in its promotional literature and brochures.

## ARTICLE 12
### Transferability

12.1 LICENSEE may transfer the LICENSED INVENTION to their affiliates, parent companies, and all other corporations, or other business identities in which each now or hereafter owns or controls directly or indirectly at least 30% of the outstanding shares, stock, or voting rights. NET SALES of ROYALTY-BASE PRODUCTS resulting from any such transfer are subject to royalty payments calculated according to Section 5.2.

## ARTICLE 13
### Independent Entities

13.1 The PARTIES are separate and independent entities. Except as may be expressly and unambiguously provided in this AGREEMENT, no partnership or joint venture is intended to be created by this AGREEMENT, nor any principal-agent or employer-employee relationship.

13.2 Except to the extent expressly provided in this AGREEMENT, neither PARTY has, and neither PARTY shall attempt to assert, the authority to make commitments for or to bind the other PARTY to any obligation.

## ARTICLE 14
### Effect of Partial Invalidity

14.1 If any one of more of the provisions of this AGREEMENT should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, and as long as the fundamental objectives of the AGREEMENT can be carried out, then: (a) the validity and enforceability of all provisions of this AGREEMENT not ruled to be invalid or unenforceable will be unaffected; (b) the provision(s) held wholly or partly invalid or unenforceable will be deemed to be amended, and the court or other government body is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the PARTIES' intent as manifested herein; and (c) if the ruling, and/or the controlling principle of law or equity leading to the ruling, is subsequently overruled, modified, or amended by legislative, judicial, or administrative action, then the provision(s) in question, as originally set forth in this AGREEMENT, will be deemed to be valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity. If, for any reason, the PATENT DOCUMENTS are deemed invalid or are proven to be invalid, LICENSEE will no longer be held accountable for payment of licensing fees.

## ARTICLE 15
### Nonwaiver

15.1 The failure of either PARTY at any time to require performance by the other PARTY of any provisions of this AGREEMENT shall in no way affect the right of such PARTY to require future performance of that provision. Any waiver by either PARTY of any BREACH of any provision of this AGREEMENT shall not be construed as a waiver of any continuing or succeeding BREACH of such provision, a waiver of the provision itself, or a waiver of any right under this AGREEMENT.

## ARTICLE 16
### Non-Interference

16.1 LICENSOR covenants and agrees not to engage in and will refrain from and all conduct that would, directly or indirectly, interfere with LICENSEE's enjoyment of the rights granted to it under the terms of this AGREEMENT.

## ARTICLE 17
### Entire Agreement

17.1 Except as may be expressly provided otherwise herein, this AGREEMENT constitutes the entire agreement between the PARTIES concerning the subject matter thereof. No prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the PARTIES with reference thereto will be of any force or effect. This AGREEMENT may only be modified by written agreement of the PARTIES.

# ARTICLE 18
## Article Headings

18.1 The ARTICLE headings contained in this AGREEMENT are for reference purposes only and shall not in any way control the meaning or interpretation of this AGREEMENT.

# ARTICLE 19
## Counterparts

19.1 This AGREEMENT may be executed in separate counterparts, each of which so executed and delivered shall constitute an original, but all such counterparts shall together constitute one and the same instrument. Any such counterpart may comprise one or more duplicates or duplicate signature pages, any of which may be executed by less than all of the PARTIES, provided that each PARTY executes at least one such duplicate or duplicate signature page. The PARTIES stipulate that a photostatic copy of an executed original will be admissible in evidence for all purposes in any proceeding as between the PARTIES.

# ARTICLE 20
## Acceptance

20.1 In witness whereof, each PARTY has caused this AGREEMENT to be executed by its duly authorized representatives:

LICENSOR: National Institute of Research and Development for Technical Physics

By: _____

Typed Name: Horia Chiriac
Title: General Director
Date: 4/10/02

LICENSEE: Demodulation LLC

By: _____
Typed Name: Jim O'Keefe
Title: President & CEO
Date: 3/29/02

# APPENDIXES

APPENDIX 1: Demodulation Incorporation Certificate

APPENDIX 2: H. Chiriac Confidentiality Agreement

APPENDIX 3: PATENT DOCUMENTS

APPENDIX 4: Sales projections from Demodulation Business Plan (Non-encoded)

APPENDIX 5: Sales projections from Demodulation Business Plan (Encoded)