**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**THE LAW OFFICES OF SEAN R. CALLAGY, LLC**
650 From Road – Suite 565
Paramus, New Jersey 07052
201-261-1700
Benjamin D. Light, Esq.
Federal Bar No.: BDL 7774

| | |
|---|---|
| DEMODULATION, INC.<br><br>Plaintiff,<br><br>vs.<br><br>CORNING INCORPORATED., ALFRED UNIVERSITY, and ALFRED TECHNOLOGY RESOURCES, INC.,<br><br>Defendants. | CIVIL ACTION NO:<br><br>2:11-cv-00296 (WJM)<br><br><br>SECOND~~FIRST~~ AMENDED<br>COMPLAINT |

1.    Demodulation, Inc. (" DEMOD" or "plaintiff") is a Delaware corporation with its principal place of business at 121 Goodwin Terrace, Westwood, New Jersey.

2.    DEMOD is the sole successor in interest to all the rights and liabilities of Demodulation, L.L.C., a New Jersey limited liability company.

~~3. Defendant Applied DNA Sciences, Inc. ("ADNAS") is a Nevada corporation with its principal place of business at 25 Health Sciences Drive, Suite 113, Stony Brook, New York.~~

4. 3.     Defendant Corning Incorporated is a New York corporation with its principal place of business at One Riverfront Plaza, Corning, New York.

5. 4.     Defendant Alfred University is a private university organized under the laws of the State of New York with its principal place of business in Alfred, New York.

6. 5.     Defendant Alfred Technology Resources, Inc. ("ATRI") is registered as a non-profit corporation of the State of New York with its principal place of business at 200 North Main Street, Alfred, New York.

### JURISDICTION AND VENUE

6 7.  Jurisdiction is proper in this court pursuant to 28 U. S. C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. 1343(3). Plaintiff is a resident of the State of New Jersey while all of the defendants are residents of states other than New Jersey. The amount in controversy exceeds $75,000. Pendant jurisdiction of state law claims is conferred by 28 U.S.C. § 1367.

7 8.  Venue is proper in this court pursuant to 28 U. S. C. § 1391 (b) (1), 18 U.S.C. § 1965, 15 U.S.C. § 15 and 28 U.S.C. 1391 (c).

### COMMON FACTUAL ALLEGATIONS

9.   DEMOD owned the rights to certain patents, trade secrets and other property concerning amorphous glass coated microwire ("microwire").

2

10. ~~The Defendants have conspired to steal DEMOD's trade secrets and to otherwise interfere in DEMOD's business opportunities.~~

11. ~~DEMOD relied upon the defendants with whom it had contracts, namely Alfred, Corning and ATRI, to fulfill those contracts in good faith. In fact, these defendants failed to perform under their contracts and actively prevented DEMOD from benefitting from the expected fruits of those contracts.~~

12. ~~DEMOD had taken reasonable steps to investigate the actions of the defendants but has not been able to fully complete its investigation because the defendants are in exclusive control of certain testimonial and documentary evidence. For example, DEMOD has attempted to speak with Dr. Alan Goldstein concerning some of the allegations below. He has indicated that due to a confidentiality agreement with Alfred, he is not permitted to speak to DEMOD about Alfred and Alfred has refused DEMOD's request to relieve Dr. Goldstein of his obligations under the confidentiality agreement.~~

8.  DEMOD was formed as a start-up company in 2001 with the objective of manufacturing and commercializing the exclusive rights it had obtained to United States Patent Number 6,270,591 – Amorphous and Nanocrystalline Glass-Covered Wires ("591 Patent"). The glass-covered wired described by the patent are referred to throughout this pleading as "microwire."

3

9~~13~~.      Microwire is a hair-like fiber that has properties which enable its remote detection upon its exposure to radio frequency waves or a magnetic field. Microwire also serves as a sensor in that it may detect and transmit information concerning the environment where the microwire is located. ~~In this respect, microwire is a covert means of tracking items. Microwire is suitable for many other purposes and applications such as rendering ships nearly invisible to radar.~~ The signal from a small strand of microwire may be detected from several kilometers without the need for any power source connected to the microwire.

10.  Microwire is superior to and serves substantially the same purpose as radio frequency identification ("RFID") technology. A consumer seeking to track the location of items, such as a retail establishment, could choose either microwire or RFID for that purpose. Accordingly, microwire technology competes with RFID.

11. Between 2001 and 2008, Demodulation obtained the exclusive rights to patents through assignment from its employees and others which related to microwire. For example, Demodulation obtained rights to patents which provided it the exclusive right to detect and encode microwire. Along with the 591 Patent, all of these patents are collectively referred to as Demod's patents.

4

12. In addition to Demod's patents, it owned and still owns certain trade secrets related to microwire such as business plans, means for altering the signal produced by microwire, applications for microwire and other matters that were and remain confidential and proprietary.

~~14.~~ 13.      DEMOD's trade secrets and patents concern, among other things, several specific methods and systems for manufacturing and engineering microwire, detecting and reading the signal produced by microwire at both short and long distances, including various means to modify and/or configure the microwire to elicit the desired performance. In order to manufacture microwire products having the appropriate behaviors and properties, highly engineered combinations of materials are selected and processed to achieve a composite structure; each structure or configuration will yield a unique magnetic structure which, in turn, defines the electromagnetic behavior needed for a given application.

~~15.~~ 14.      Microwire has properties with myriad applications for the homeland security, national defense, article tracking and authentication, energy and other industries. The United States Department of Energy, through its laboratory at Oak Ridge, Tennessee, has thoroughly evaluated DEMOD's technology and trade secrets and reached the following conclusions: tension on the microwire alters the response from the microwire making

it suitable for "temperature, pressure, chemical and biological sensing"; the microwire's response is altered by its angular relation to an alternating magnetic field making it suitable for a "pitch, yaw and roll" sensor; a break in the microwire can be detected making it suitable for tamper indication; the microwire can detect tension when deployed in non-ferrous material; "Microwires appear to have unique signatures, similar to differences among fingerprints or snowflakes. These signatures can be modified by incorporating minute magnetic material at different locations along the length of the microwire. In addition, if localized stress variations along the length are incorporated, these too, change the signature. This experiment validated the belief that an encoding method is feasible and supports Demodulation's encoding patents. The unique signature and/or ability for encoding could have many benefits, including a defense for counterfeiting;" DEMOD's microwire was superior to magnetic strips found on credit cards and other similar technologies because microwire is practically invisible and never wears out, unlike the magnetic strips; DEMOD's microwire was an "excellent candidate" for *in-situ* sensors and there is a robust market with "few competing products" "available for exploitation;" microwire was well suited for detection of particular "gas**,** pressure, temperature, humidity;" If microwire were attached to a seal, a broken seal would be identified; the

6

glass coating on a microwire may be "coated with a substance
that will react when attacked by a chemical or biological
agent;"

~~16.~~  15.        DEMOD recognized these applications and others
well before the DOE's evaluation. To capitalize on these
applications, DEMOD partnered with Alfred University through a
contract effective July 1, 2002 executed by David Szerbacki, the
Provost of Alfred University at the time ("Alfred Contract").
~~designed to maximize the commercial and governmental~~
~~applications for microwire and to attract research funds to~~
~~accomplish this goal.~~
~~17.        In 2003, DEMOD and Alfred signed an agreement whereby,~~
~~among other things, Alfred was granted a one percent (1%)~~
~~royalty on DEMOD's gross sales of commercial products in~~
~~exchange for Alfred's endeavoring to gain state, federal and~~
~~private funding and support for the advancement of applications~~
~~of DEMOD's technology and trade secrets, and for Alfred's~~
~~support in commercializing DEMOD's technology. This agreement~~
~~was modified from time to time by the parties and continued in~~
~~effect until 2008.~~
16.  The Alfred Contract required Alfred to seek funding for
DEMOD from the "U.S. Government, New York State government and
other research sponsors" and to "provide facilities, equipment,
and personnel to pursue the Project." In exchange, Alfred was

7

granted a one percent (1%) royalty on DEMOD's gross sales of commercial products. This Alfred Contract was modified from time to time by the parties and continued in effect until 2008.

18. 17.      At about the time Alfred Contract was executed, and DEMOD entered this agreement, Alfred stated in writing that microwire rivaled the laser in terms of potential economic impact and that the probable annual market for microwire products was between $250,000,000 (TWO HUNDRED FIFTY MILLION DOLLARS) and $20,000,000,000 (TWENTY BILLION DOLLARS). In 2008, Alfred stated that microwire technology was still worth hundreds of millions, if not billions, of dollars per year.

19. 18.      Pursuant to Alfred's contractual obligations the Alfred Contract, DEMOD was invited by Alfred to locate its New York operations at the Ceramic Corridor Innovation Center ("CCIC") at Alfred, New York at no cost to DEMOD. CCIC was and is owned and managed by Alfred Technology Resources, Inc. ("ATRI"), which is a non-profit corporation jointly formed as a result of a partnership agreement between Alfred and Corning. On information and belief, the agreement between Alfred and Corning to create and operate ATRI was reduced to writing by them. , owned and operated by Alfred and Corning. Robert Ecklin, an Executive Vice President at Corning and a member of the board of the SUNY Research Foundation ("RF") and Chair of its Audit Committee, was also President of ATRI. The management team of

ATRI consisted solely of either Alfred or Corning personnel or persons tied closely to those two entities.

19. DEMOD accepted the offer to move into the CCIC and thereby entered into a contract with ATRI. DEMOD moved into the CCIC in 2003 and remained there until 2008. The terms of the contract with ATRI required ATRI to provide DEMOD with access to the CCIC facilities and "intellectual property management," "investor/strategic partner linkages," "links to higher education institutions," "international trade assistance," "general legal services," and "technology commercialization" and other services. In addition, Demod also entered into a non-disclosure agreement with ATRI which required ARTI to hold in confidence all confidential information revealed to it by Demod.

20.        ~~CCIC~~ ATRI was established and financed with at least $10,000,000 in New York and federal government funds to act as a business incubator to provide facilities and the services listed above, ~~services and other assets~~ to emerging companies like DEMOD for the development of ceramics-related technologies. ~~and jobs related to those technologies.~~ CCIC advertised that the companies that become its tenants were "under its care." ~~In addition to facilities, some of the services offered by ATRI to DEMOD and others through the CCIC were: "intellectual property management," "investor/strategic partner linkages," "links to higher education institutions," "international trade~~

assistance," "general legal services," and "technology commercialization."

21.     DEMOD accepted the offer to move into the CCIC and thereby entered into a contract with ATRI; the terms of which required ATRI, at a minimum, to provide the services mentioned in the preceding paragraph. DEMOD moved into the CCIC in 2003 and remained there until 2008. ATRI was entrusted with at least $10,000,000 in funds from New York state and the federal government to manage and spend for the benefit of start-up companies like DEMOD. ATRI was therefore a trustee of those funds and DEMOD was a beneficiary to whom ATRI owed fiduciary obligations.

22.     DEMOD executed written non-disclosure agreements with Alfred, ATRI and Corning to protect the intellectual property and trade secrets it agreed to reveal to those defendants. DEMOD revealed extensive trade secrets to these defendants. Alfred also arranged for and encouraged DEMOD to explore a business relationship with Corning. As a result of Alfred's referral, DEMOD and Corning entered into a written "Confidentiality Agreement" on May 23, 2002 which was subsequently amended and re-affirmed on July 15, 2004. This agreement required Corning to hold DEMOD's confidential information in confidence and to not use the information "other than for the purposes of its business with Demodulation."

23. ~~After DEMOD established its contractual relationships with Corning, Alfred, and ATRI, and after DEMOD revealed confidential information to them, Corning met with representatives of Advanced Coding Systems ("ACS"), an Israeli corporation and a competitor of DEMOD's at that time in that ACS was producing in Israel what it referred to as "glass coated amorphous magnetic MicroWires." ACS was and remains a subsidiary of Elbit Systems, Ltd., ("Elbit") a multinational Israeli defense contractor.~~ Demod revealed written confidential information to Corning including a copy of a business plan within weeks after execution of the Confidentiality Agreement. This business plan included ideas concerning the market, applications, expenses and expected returns.

24. ~~Corning and Elbit were partners in a company called CyOptics, Inc.~~ At the time Corning entered into the Confidentiality Agreement with DEMOD and while Corning was operating ATRI, Corning was engaged in efforts that competed with DEMOD and which were not disclosed by Corning to Demod.

25. Corning had invested approximately $800,000,000 to purchase a company called Intellisense, thereby forming Corning Intellisense, which produced technology that competed with DEMOD's. Intellisense focused on Micro Electro Mechanical Systems ("MEMS") devices which have applications in the areas of wireless sensors, ~~radio frequency devices~~ RFID and other areas

where microwire is considered a competing technology. ~~Without disclosing this conflict of interest and others, and while operating ATRI, Corning proceeded to actively interfere with DEMOD's business and other proprietary interests. Corning's failure to disclose its conflicting commercial interests to DEMOD was a breach of the common law, contractual and fiduciary obligations Corning owed to DEMOD.~~

26.     Corning and Alfred had further undisclosed interests which conflicted with their obligations to DEMOD. Infotonics Technology Center, Inc. ~~The Center for Excellence in Photonics~~ ("Infotonics") in Canandaigua, New York was also a non-profit formed by Corning with other partners based on the ARTI model, and included Alfred as an "academic partner." While DEMOD was at the CCIC and unbeknownst to DEMOD, Infotonics was carrying out work to develop commercial and military applications for remote micro-sensors for stress, vibration, humidity and micro-energy harvesting devices. Neither Alfred nor Corning disclosed this conflict of interest to DEMOD at any time. As determined by DOE, DEMOD's technology performed all these functions well and therefore competed with the technology being developed at Infotonics.

27.     The CCIC was declared in its own publication from 2001, which was written by Charles Gargano, to be the model for the formation of Infotonics, which was also funded with state

and federal government money to operate as a center where start-ups and entrepreneurs would find a support system. On June 25, 2008, Sam Casella, the Director of Government Relations for Infotonics, stated publicly that Infotonics was being operated in violation of the laws governing not-for-profit corporations and that the way Infotonics was being operated "flies in the face with the State of New York."*(sic)* Subsequently, Infotonics merged with another state funded facility in Albany after Infotonics created less than 100 jobs out of the 5000 promised.

28.     Through its substantial political and commercial influence, Corning advocated and ensured that DEMOD received no funding that was available for investment in technologies like DEMOD's. It did so to protect its conflicting interests, such as the work performed at Infotonics.

29.     Robert Ecklin served on the RF with Dr. James Hayward, the CEO of ADNAS, defendant herein. Mr. Ecklin and Dr. Hayward, acting on behalf of Corning and ADNAS respectively, ensured that DEMOD received no grants or similar financial assistance from the RF or similar New York State entities such as the ESDC, but that ADNAS did. Corning and Ecklin also provided ADNAS and Hayward proprietary information concerning the characteristics and specifications of DEMOD's microwire and its methods for encoding and detecting the microwire.

30.        Mr. Ecklin, while acting on behalf of Corning, publicly made false statements and derogatory comments concerning DEMOD's technology, stating that it was insignificant and not deserving of investment at a meeting of government representatives attended by, among others, then State Representative George Winner, James Guccinski of NAVSEA Crane, A.J. Colletti of the New York State Office of Disaster Preparedness and Response, Dr. William LaCourse of Alfred, and Bill Heaney of then Governor Pataki' s office. At this meeting, Ecklin further stated that DEMOD did not own the intellectual property rights concerning microwire which it had claimed to.

31. 28.        Corning stated to others that to DEMOD's microwire technology actually belonged Corning and was insignificant. One person who heard such a statement in 2006 was Shawn Hogan who heard Tom Trantor, the head of government relations for Corning, state to him that DEMOD did not own its technology and had stolen it from Corning. DEMOD also heard from NYSTAR representatives in 2007 that there seemed to be a dispute between Corning and DEMOD concerning the ownership of microwire.

32. 29.        At no time did Corning have any ownership interest in microwire.

33. 30.        DEMOD also learned in early 2006 from Robert Iszard, the local executive of the ESDC, that a Corning representative had stated to him and others that DEMOD did not

own its technology and that DEMOD did not have the capability to produce microwire.

~~34.~~ 31.        Once Mr. Iszard witnessed DEMOD's manufacturing process and was apprised of DEMOD's patents, he stated that he was surprised to learn these things and advised DEMOD to contact another executive with the ESDC, Fred DiMaggio.

~~35.~~ 32.        Mr. DiMaggio was the ESDC executive responsible for homeland security projects.

~~36.~~ 33.        Corning interfered in DEMOD's negotiation with In-Q-Tel Corporation. Corning Board member John Seeley Brown was also a Board member of In-Q-Tel. Mr. Brown, while acting in his capacity as board member of Corning, directed that In-Q-Tel cease all negotiations with DEMOD despite interest from other In-Q-Tel representatives. DEMOD was warmly introduced to In-Q-Tel by employees or former employees of the Central Intelligence Agency. As a result of Corning's interference, In-Q-Tel denied any funding to DEMOD without any formal evaluation. Subsequently, in late 2010 after Brown retired from his position at In-Q-Tel, In-Q-Tel inquired whether DEMOD would be interested in exploring the same opportunities that existed in the first attempted negotiation that Corning interfered with.

34. As described more fully below, Corning, Alfred and ATRI acted independently and in concert to breach their contracts with Demodulation and to commit fraud other wrongs against

15

Demodulation. One means used to commit these breaches and other wrongs was Alfred's and Corning's domination and control of ATRI.

35. The domination and control of ATRI by Corning and Alfred included:

    a. the right of the President of Alfred University appoint memebers to the ATRI Board of Directors;

    b. Corning's treatment of ATRI as its "outside research department" as stated under oath by ATRI President and Corning Executive Vice President (concurrently) Robert Ecklin;

    c. the use of $5,000,000 of ATRI funds to build "clean space" for Corning's wholly owned photonics subsidiary business without even seeking payment from Corning and which expenditure cause ATRI to become insolvent;

    d. Alfred's act of providing space at the CCIC to DEMOD without the need to get separate approval from ATRI;

    e. Ecklin's failure to fulfill any obligations of the President of ATRI imposed by ATRI's bylaws which included the "general charge and supervision of the business and affairs of [ATRI]. Ecklin considered himself no more than a "master of ceremonies;"

    f. Corning's use of ATRI facilities and assets to develop strengthened glass for use in mobile display devices;

g. Alfred's forgiveness of a loan to ATRI;

h. ATRI's failure to observe corporate formalities such as actual requiring its corporate offices to fulfill the obligations imposed on them by the by-laws of the corporation and by permitting Demod to become an incubator tenant without a formal written contract.

36. Demodulation remained at the CCIC until February of 2008 when it discovered records indicating that Alfred had obtained research funding from New York state based on Alfred's representation that Demodulation has committed funds to the research project, which was not true.

37. Demodulation has since learned that Alfred President Charles Edmondson arranged for a "bogus grant" to Alfred from a New York state agency in 2005 which Demodulation knew nothing about until after this lawsuit was first filed. Demodulation has also learned after the initial filing of this lawsuit that:

a. The grants Alfred was seeking for Demod were unlawfully and fraudulently controlled by then Governor George Pataki and his operative, Jeff Lovell. These grants were by law to be awarded based on their technical merit after review by experts. Alfred never disclosed this fact to Demod until discovery in this case;

b. Alfred refused to support to Demod's efforts to obtain funds because they conflicted with other initiatives

Alfred was trying to fund such as Alfred's "BIOS"
program and its joint venture with West Virginia
University but Alfred never disclosed these conflicts to
Demod.

c. Alfred knew as early as 2002 that Demod's efforts to
obtain funding from New York state agencies would be
futile because they conflicted with Alfred's other
funding requests to those agencies. Alfred never
disclosed this to Demod but rather, Alfred decided to
let Demod "play out the string".

37.    After being referred by Alfred in furtherance of its
contract with DEMOD, DEMOD met with the Empire State Development
Corporation ("ESDC") to seek funding. DEMOD provided
confidential intellectual property and trade secrets to ESDC in
order to discuss its technology and applications. One of the
applications discussed and disclosed was DEMOD's then patent
pending combination of DNA technology with microwire. Charles
Gargano was, at the time, the Chairman of ESDC and a shareholder
in ADNAS. DEMOD did not know of Gargano's interest in ADNAS at
the time it applied for ESDC assistance and disclosed its
proprietary information to it. The actions alleged herein to
have been taken by Mr. Gargano are alleged to have been taken in
his capacity as an agent of ADNAS and in furtherance of those
interests.

38. Demod has also learned after this lawsuit was filed and through discovery that Corning breached its confidentiality agreement with Demod by engaging in a joint development project in 2004, which may be continuing, with four other companies to develop an RFID application for microwire. This project was being managed by the same Corning executive that was the "sponsor" of the confidentiality agreement between Corning and Demod. Information necessary for this application was disclosed by Demodulation to Corning in 2002.

38.      Corning acted to blackball DEMOD and actually did so because they were working in competing areas or with competing companies. DEMOD was advised by Erland Kailbourne this had occurred and that DEMOD should move from New York State since it could expect no funding or support from the state or private investment firms as long as Corning was opposed to DEMOD.

39.      As DEMOD was being suppressed, ADNAS received government funding from the RF, was relocated to the government funded Long Island High Technology Incubator ("LIHTI") formed a working relationship with Brookhaven National Laboratory, hired Dr. Yacov Shamash, and thereafter secured military or other government contracts for its products. Those products, both those utilizing microwire and those that did not, competed with microwire in one or more applications including but not limited to articles tracking, surveillance and authentication.

40.      Also at about the same time, ADNAS announced that it had formed a business relationship with ACS to acquire ACS' microwire product and combine it with DNA technology for anti-counterfeiting and other applications.

41.      DEMOD inquired of ADNAS' CEO, Peter Brocklesby, why ADNAS had chosen ACS instead of DEMOD. Mr. Brocklesby replied by e-mail in September of 2005 that ADNAS had never heard of DEMOD, that ACS was "recommended" to ADNAS by an "individual from New York," and that ADNAS would conduct an investigation concerning the intellectual property at issue and get back to DEMOD.

42.      Brocklesby thereafter stated in an e-mail in September 2005 that ADNAS decided to cancel its business arrangement with ACS and to refrain from using microwire altogether. However, ADNAS continued to use microwire from ACS in its products. It did so by acquiring ACS' microwire through an intermediary, International Imaging Materials, Inc. ("IIMAK").

43.      ADNAS also continued its direct relationship with ACS. ADNAS made a presentation to the Far East Empire Group, SDN BHD ("Far East"), a Malaysian Corporation, sometime after May of 2006. Far East was incorporated in May of 2006 so the presentation could not have taken place before that. Far East was acting as a consultant for the Malaysian government and the presentation focused on security features for passports and visas. In this presentation,

20

ADNAS stated that it jointly produced with ACS "DNA Embedded Amorphous Micro Wire security products."

44.      Soon after he made the statements described above, Mr. Brocklesby, formerly employed by the Central Intelligence Agency's proprietary Air America and the defense contractor E-Systems, was replaced by Dr. James Hayward as CEO of ADNAS. Dr. Hayward served on the Board of RF and served as a consultant to ADNAS before becoming its CEO. Prior to becoming CEO, and while acting as a consultant for ADNAS, Hayward, and ADNAS unlawfully arranged to have ADNAS receive approximately $240,000 in grants from RF, to have ADNAS installed at LIHTI, and to have ADNAS acquire ACS' microwire.

45.      DEMOD filed formal complaints with the SUNY General Counsel, the New York Inspector General's office, the New York State Comptroller's Office, the Attorney General of the State of New York, federal authorities at the Department of Justice and the New York Commission on Investigations.

46.      In December of 2010, Gregory Stasiuk, Chief of Intelligence for the New York State Attorney General, recommended that a formal investigation be launched into the allegations made by DEMOD. The present status of that investigation is unknown to DEMOD. At the time, Ellen Biben was Mr. Stasiuk's supervisor. Ms. Biben had previously claimed that

the Attorney General's Office did not have jurisdiction over
DEMOD's allegations.

47.  39.      As a direct and proximate result of the actions
and inactions of the defendants as alleged herein, DEMOD
suffered damages. By way of example and not limitation, Family
Dollar corporation stated to DEMOD that it was losing
$400,000,000 per year as a result of theft and other loss of
product. Family Dollar stated that if DEMOD received the funding
it was seeking through its relationship with Alfred in the
approximate amount of $2,000,000, it would enter into a contract
with DEMOD to supply Family Dollar with an articles tracking
system. Due to the actions alleged below including the
allegations that the defendants conspired to suppress DEMOD by
withholding available funding and taking other actions, DEMOD
was not able to execute the contract with Family Dollar.

48. 40.      As a further direct and proximate result of the
defendants' actions and inactions, DEMOD suffered out of pocket
losses such as the cost of locating some of its operations at
the CCIC and the loss of the company's capital which was wasted
in pursuing a business relationship with these defendants while
they were actively conspiring against DEMOD.

49.  41.      DEMOD was further injured in that, without
capital investment, it was unable to continue to pay the

applicable fees to maintain some of its patents. DEMOD seeks reinstatement of any such patents as relief in this case.

## COUNT ONE

(NEW JERSEY CIVIL RICO - N.J.S.A. 2C:4l-2(c))

50. 42.        Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

51. 43.        Pursuant to N.J.S.A. 2C:4l-2(c): It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

52. 44.        ~~Defendants, Corning, Alfred, ADNAS and ATRI together constitute an enterprise within the meaning of N.J.S.A. 2C: 41 1 (c) ("ADNAS Enterprise"). Further,~~ Corning, Alfred and ATRI constitute a separate enterprise through their interest in the CCIC ("CCIC Enterprise"), as alleged more specifically below.

53. 45.        These defendants engage in trade or commerce, or in activities which affect trade or commerce.

54. 46.        Corning, Alfred and ATRI were associated with the CCIC, and conducted or participated, directly or indirectly, in the conduct of the affairs of the CCIC enterprise through a

23

pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c). ~~Corning, Alfred, ATRI and ADNAS participated, directly or indirectly, in the conduct of the affairs of the ADNAS Enterprise through a pattern of racketeering activity in violation of N. J. S. A.2C: 41-2 (c).~~

47. The operation of the CCIC Enterprise was conducted through a high degree of planning amongst these defendants. Specifically:

      a. Corning and Alfred agreed to and did form a partnership to found ATRI as a vehicle to lobby for and acquire at least $10,000,000 in funds from the New York State legislature to capitalize ATRI;

      b. Corning and Alfred agreed that ATRI would be operated by a board of directors consisting solely of Corning or Alfred personnel and it has in fact been so operated;

      c. After ATRI was formed and at the direction of Corning and Alfred, ATRI executives including ATRI President and Corning executive Robert Ecklin, abdicted their role to operate ATRI as an independent corporation and instead took direction from Corning and Alfred to operate ATRI as Corning's "outside research department";

      d. Alfred possessed and exercised the right to dispose of the assets of ATRI without ATRI's approval;

48. Accordingly, the enterprise was structured in such a way that decisions regarding the operation of ATRI were actually

made by Corning and Alfred rather than ATRI and ATRI consented
to this structure. These decisions included which businesses
would become tenants at the CCIC, which tenants would receive
financial benefits from ATRI and which tenants ATRI would spend
its cash to benefit.

49.     As a result of this hierarchy, Alfred and Corning
dictated that ATRI approve the expenditure of $5,000,000 of the
funds it received from New York State to build a clean space at
the CCIC facilities for Corning to operate its photonics
business.

50~~55~~.      A pattern of racketeering activity includes two
or more incidents of racketeering conduct that have "either the
same or similar purposes, results, participants or victims or
methods of commission or are otherwise interrelated by
distinguishing characteristics and are not isolated incidents."
N.J.S.A. 2C: 41-1 (d)(1) These defendants engaged in such a
pattern of activity.

51~~56~~.      These defendants participated in the crimes
described below, which had the same or similar purpose, results,
participants, or victims or methods of commission and were
otherwise interrelated by distinguishing characteristics and
were not isolated incidents. The overall pattern was to use for
their own benefit the money given to ATRI by New York State,
which was conditioned upon ATRI's administration of those funds

for the benefit of start-up businesses like DEMOD, rather than for its intended purpose. ~~unlawfully capture and control emerging technologies like DEMOD's and the funding of those technologies for their own direct or indirect benefit.~~

52.      The CCIC Enterprise is ongoing. Specifically, ATRI claims to own a "wholly owned subsidiary" called Nanomaterials Innovation Center, LLC ("NMIC"), a for-profit company. In September of 2008, ATRI received a $1,000,000 grant from New York State for the establishment of a "nanomaterials lab" at the existing CCIC facility. Rather than creating a lab within the CCIC, ATRI has used and continues to use this grant money to fund the operations of NMIC.

53.      NMIC is a manufacturer of "nanopowders" for sale to industry and has executed contracts to supply nanopowders to at least two companies; Sigma Aldrich and EMD-Merck.

5~~4~~57.      The crimes perpetrated by these defendants in furtherance of the pattern of racketeering activity and the conspiracy include:

a. N.J.S.A. 2C:20-4, Theft by deception. (i) By purposefully creating and reinforcing false impressions as to law, value, intention or other state of mind through written and verbal statements and by preventing DEMOD from acquiring information which would affect its judgment of transactions and by failing to correct a false impression

26

which these defendants created or reinforced or knew to be
influencing DEMOD while these defendants stood in a
fiduciary or confidential relationship with DEMOD, these
Defendants committed theft by deception; (ii) In addition
to the allegations above, and by way of specific example
and not limitation, Corning, Alfred and ATRI created the
false impression that they were operating the CCIC as a
legitimate business incubator and conduit of government
~~research~~ funds while in fact they were operating the CCIC
for their own benefit or the benefit of persons and
entities employed by these defendants or corporations
related to these defendants or other members of the
enterprise; (iii) DEMOD relied upon the false impressions
created and reinforced by these defendants when it became a
tenant at the CCIC, stored its property there, and
disclosed its trade secrets to these defendants including
but not limited to trade secrets concerning a combination
of microwire and DNA technology; (iv) In addition, in order
to induce DEMOD to contract and disclose its trade secrets,
Alfred created the false impression that it would assist
DEMOD in obtaining state, federal and private funds for the
joint development of DEMOD's technology; (v) However,
Alfred never disclosed that it was not able to perform
these obligations due to conflicting obligations to third

parties that it never disclosed to DEMOD; (vi) In addition, Corning and Alfred never disclosed their conflicting interests to DEMOD, including Corning's interaction and relationship with GMT/AMT for the purposes of developing an RFID application for microwire with Texas Instruments and others ACS and Elbit, Corning's interest in Corning Intellisense, and the work being done by Corning at Infotonics Technology Center, Inc.; (vii) These defendants knew that DEMOD did not consider them competitors but never corrected that impression; (viii) As a result of the violations of this law, the Defendants obtained DEMOD's trade secrets and then used those trade secrets to benefit themselves by obtaining government grants and other things of value, as described herein. These defendants obtained at least $10,000,000 from the State of New York to capitalize ATRI by creating the false impression that they intended to use the money benefit of independent start-up companies when in fact they intended to use the money for their own benefit; (ix) DEMOD relied upon the false impressions created and maintained by these defendants and as a result of the violations of this law, defendant's obtained DEMOD's trade secrets and then used those trade secrets to benefit themselves.

28

b. McKinney's Penal Law § 175.30 and § 175.35 – Offering a False Instrument for Filing. (i) Defendants Corning, Alfred and ATRI violated this statute in order to benefit the enterprise in connection with Contract C00007l with the New York State Office of Science Technology & Academic Research ("NYSTAR").(ii) Alfred and Corning knowingly filed or offered for filing with NYSTAR written instruments that contained false statements or false information; (iii) By way of example and not limitation, Alfred and Corning made a representation in Contract C00007l that Corning had committed $200,000 in cash and at least $760,370 in equipment and other support to further the work described in the NYSTAR Contract which was the establishment of the Alfred University Advanced Research Center ("ARC") at the CCIC; (iv) The Contract also required that regular certified progress reports be submitted to NYSTAR concerning the expenditures of NYSTAR and matching funds described in the Contract; (v) NYSTAR committed $850,000 in grant money pursuant to the Contract based in part on the representation that Corning had committed the assets described above; (vi) On an undated 2002-2003 Reporting Form filed with NYSTAR, Alfred and Corning represented that Corning had completed a contribution of equipment worth $724,482 by December 31, 2002 ; (vii) This representation

29

was knowingly false as Corning did not contribute equipment with anything remotely close to that value by that date; (viii) The only equipment ever donated by Corning was equipment which Corning had declared to be without value for tax purposes and which was never removed from the boxes in which it arrived; (ix) Alfred knowingly made further misrepresentations to NYSTAR on documents filed with NYSTAR; (x) Alfred reported on another undated 2002-2003 reporting form that grant money from the $850,000 NYSTAR grant was being spent to assist DEMOD to "setup a manufacturing facility in association with the ARC"; (xi) This representation was false as DEMOD independently established its manufacturing process without any assistance from any of these defendants and never had any agreement with the ARC; (xii) DEMOD was never aware of the misrepresentations to NYSTAR described herein or that any NYSTAR money had been allocated to it until after it investigated an e-mail exchange with NYSTAR on January 8, 2008; (xiii) In that e-mail exchange between DEMOD and NYSTAR, a NYSTAR employee, Kathy Wise, informed DEMOD that NYSTAR's records showed numerous misrepresentation made by Corning and Alfred in documents filed with NYSTAR; (xiv) For example, the records showed that these defendants falsely represented to NYSTAR in 2007 that DEMOD and

30

Corning were the "two chief local companies participating in the ARC" and that an entity called the Center for Advanced Technology ("CAT" or sometimes referred to by Alfred and NYSTAR as theCenter for Advanced Ceramics Technology ("CACT")) operated by Alfred had received $500,000 in cash from DEMOD to develop "glass fibers with codeable amorphous metal interiors"; (xv) DEMOD never contributed that cash and these defendants made that representation in order to obtain government funds from NYSTAR, which they did.

c. 18 U.S.C. § 1831 Economic Espionage. (i) Demod disclosed its trade secrets to Corning; (ii) The trade secrets disclosed included but were not limited to those concerning a means of removing the glass coating from the microwire and DEMOD's idea for combining microwire with DNA technology; (iii) At the time this disclosure was made, Mr. Ecklin was a member of the RF as was Dr. Hayward, the CEO of ADNAS; (iv) At about the same time and continuing thereafter, RF provided grants to ADNAS to develop different product applications; (v) Corning and/or ADNAS disclosed the trade secrets to ACS, an Israeli company; (vi) This disclosure was made so that ADNAS could determine if the ACS product could be combined with ADNAS' DNA technology in the same way that DEMOD's microwire could;

(vii) ADNAS and ACS subsequently entered into a contract whereby ADNAS and ACS agreed to marry their two technologies; (viii) This agreement was widely publicized at a time when DEMOD was attempting to obtain financial assistance and investment.

d. New York Penal Law § 200.25. Receiving Reward for Official Misconduct. (i) Dr. Hayward was on the Board of the RF and an agent or employee of ADNAS when the RF agreed to provide approximately $240,000 in grant money to ADNAS; (ii) Dr. Hayward arranged for this grant and as a result, he was rewarded by ADNAS in the form of cash and stock; (iii) Facts relevant to this particular allegation of criminal conduct are described more fully below.

e. New York Penal Law § 195.20 Defrauding the Government. (i) While holding the position of public servant by virtue of his membership on the Board of RF and while acting as an employee or agent of ADNAS, Hayward engaged in a scheme to defraud New York state and possibly the United States if the RF grant money given to ADNAS included any federal funds) by using the RF grant money for his own private business purposes through ADNAS; (ii) The grant money was used to fund ADNAS and Hayward was compensated by ADNAS for obtaining the grant money.

f. 18 U.S.C. § 1341, 1343, 1346 — Mail and Wire Fraud. (i) On April 17, 2006, ADNAS filed with the United States Securities and Exchange Commission Amendment No. 7 to Form S8-2 as required by the Securities Act of 1933 ("Amendment 7"); (ii) Therein, ADNAS stated that it had entered into a contract with RF in February of 2006 to receive grants from RF in the approximate total of $160,000 to support ADNAS' proprietary research; (iii) On November 13, 2006, ADNAS filed with the United States Securities and Exchange Commission Amendment No. 8 to Form 88-2 as required by the Securities Act of 1933 ("Amendment 8"); (iv) Therein, ADNAS stated that it had entered into a contract with the RF in February 2005 to receive grants from RF in the approximate total of $240,000 and that approximately $160,000 of that total had already been provided; (v) At the time ADNAS entered into this contract with RF, Dr. Hayward was on the Board of RF and was either a paid consultant for ADNAS or an executive with ADNAS; (vi) The date indicated in Amendment 7 as the date of the contract between ADNAS and RF was a misrepresentation designed to obscure the fact that Dr. Hayward and ADNAS arranged the grants from RF in exchange for making Dr. Hayward the CEO of ADNAS and its single largest shareholder; (vii) The grant to ADNAS from RF was illegal based on Hayward's position with ADNAS at

the time, as alleged above; (viii) ADNAS and Hayward thus used the mail or wires in furtherance of the scheme by reaching an agreement to compensate Hayward as a kickback for ADNAS' receipt of grant money from the RF and relocation to the LIHTI; (ix) In order to cover up this scheme, ADNAS and Hayward transmitted via the mail or wires Amendments 7 and 8 described above.

g. (i) ADNAS further committed wire fraud when ADNAS stated in an e-mail in July 2005 that it had chosen to do business with ACS because, in part, it had never heard of DEMOD; (ii) This statement was false when it was made as ADNAS had already claimed to have determined that ACS was the only source of microwire in the world; (iii) Any rudimentary investigation would have directed ADNAS to DEMOD; (iv) Further, ADNAS was made aware of DEMOD and its microwire before the e-mail was sent through its participation in a textile markings program operated by the Department of Commerce through cooperation with Oak Ridge National Laboratory.

h. (i) ADNAS further committed wire fraud when it sent emails in 2005 to DEMOD on September 6th and a few days later stating that it had decided to terminate its agreement with ACS and refrain from using any microwire in its products whatsoever; (ii) These statements were false

34

as the agreement was never terminated as evidenced by the presentation made by ADNAS and ACS to Far East.

ci. 18 **U.S.C.** § 1341, 1343 – Mail and Wire Fraud. (i) By filing the documents described in paragraph 4854(b) through the mail or wires, and by using the mail or wires as otherwise alleged herein, Corning, Alfred and ATRI knowingly furthered their scheme to suppress DEMOD and defraud the State of New York; (ii) The misrepresentations in those filed documents were made for the purpose of obtaining money or property, which they did;. (iii)By using the mail or wires including internet advertising to communicate false information concerning the disposition of ATRI's assets and the number of new jobs created by start-up businesses at the CCIC, Alfred, Corning and ATRI committed mail or wire fraud.

j. New York Penal Law § 100.00 et seq. Criminal Solicitation. (i) The Chairman of Board of Trustees of Alfred, Peter Cuneo, arranged a meeting between DEMOD CEO James O' Keefe and Mr. Pat Butler of the Washington Post; (ii) At this meeting, Mr. Butler, who is a former Trustee of Alfred, stated that he played golf regularly with Donald Rumsfeld and would be willing to discuss DEMOD's technology with him for possible government applications; (iii) After the meeting, Mr. O' Keefe met with Mr. Cuneo and informed

him of Mr. Butler's statements; (iv) At this meeting, Mr.
Cuneo requested a $50,000 fee be paid to Mr. Butler as
consideration for his advocating DEMOD's technology to Mr.
Rumsfeld; (v) DEMOD refused this solicitation which was an
illegal attempt to lobby the United States Department of
Defense.

k. New York Penal Law § 155.05 - Larceny. (i) Corning
committed larceny when it obtained DEMOD's trade secrets
and microwire samples with the intent to appropriate them
for itself; (ii) Specifically, Corning obtained the
property by the false promises contained in the non-
disclosure agreement with DEMOD and the promise it made to
promote DEMOD's technology to the state when it never
intended to fulfill those promises.

~~58~~55.    DEMOD was directly and proximately injured in its
business by these defendants' ~~violation of this statute~~conduct
described above. ~~The damages sustained by DEMOD are generally
described above.~~ But for the fact that these defendants operated
the CCIC as racketeering enterprise to further their own
interest ~~and suppress DEMOD's~~, DEMOD would have obtained
commercial contracts for its products ~~including but not limited
to its electronic articles surveillance and authentication
system. But for the conspiracy, DEMOD would have reached a deal
with ADNAS~~and if DEMOD had known about the racketeering

enterprise described herein, it would not have located its operations at the CCIC. Further, these defendants' operations of the enterprise described herein deprived DEMOD of at least $5,000,000 at ATRI assets that would have been used to assist DEMOD had the money not been spent to build a laboratory for Corning.

**COUNT TWO**

(NEW JERSEY CIVIL RICO - N.J.S.A. 2C:41-2(d))

~~59~~56. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~60~~57. The defendants named in Count 1 agreed with each other that they would commit all or some of the racketeering acts identified therein with knowledge of the unlawful objective of using the CCIC to obtain funds from New York State for their own benefit and to cover-up the actual use of funds provided~~preventing DEMOD from bringing its product to the market and with the intent to accomplish that objective~~.

58. By way of example and not limitation, Robert Ecklin knew that the information concerning the revenue and jobs created by the CCIC that was being transmitted by the wires was false but agreed with Alfred and ATRI to no correct the falsehoods and to allow them to be continuously transmitted by wire over the internet.

6159.     DEMOD was directly and proximately injured in its business by these defendants' violation of this statute, as described hereinabove.

**COUNT THREE**

(FEDERAL CIVIL RICO - §1962(c) AGAINST CORNING and ALFRED)

6260.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

6361.     Corning and Alfred are "persons" who operated an "enterprise," the CCIC, through a pattern of racketeering activity.

6462.     Corning and Alfred participated directly in the founding operation and management of the CCIC and continue to do so.

6563.     Corning and Alfred conducted the affairs of the enterprise through a pattern of racketeering activity as described above and committed the predicate acts of mail and wire fraud as set forth above.

6664.     This pattern is ongoing, as explained above concerning the NMIC, and as the enterprise presently is broadcasting by way of the internet that DEMOD is a "graduate" of its program which is a further act of wire fraud.

67.     The CCIC defines a "graduate" as a company that "becomes commercially viable and moves on to their own facility." DEMOD

has not done either of those things and these defendants know it but continue to broadcast this false information by the wires.

6865.    The statement being broadcast on the internet is false and is meant to make it appear as though the CCIC is accomplishing its mandate to spur the growth of early stage technology companies. This statement constitutes another act of racketeering activity as it is a violation of 18 U.S.C. § 1341, 1343.

6966.    In fact, the CCIC was and is used by Corning and Alfred as an "outside research facility" to facilitate the development of companies or business units formed by themselves or their employees such as Corning's photonics technology project business, Santanoni Glass, Saxon Glass Technologies, Raymond Family Business Institute, CerCor Separations, CS&S Thermomechanical Laboratory, Corning Microarray Technologies and Corning Optical Networking Devices.

7067.    Thus, while the CCIC is advertised to the public by these defendants as a business incubator for start-up companies, it has been and continues to be used to subsidize the commercial interests of these defendants.

7168.    Corning's and Alfred's racketeering activity at the CCIC has been repeated by them the Infotonics facility, as described above.

~~72~~69.      CCIC had an existence and purpose separate and apart from these defendants' use of CCIC as an enterprise. Specifically, the CCIC is an actual physical facility that ~~houses~~ has hosted at least one tenant~~s~~ unrelated to the enterprise.

~~73~~70.      DEMOD was directly and proximately injured in its business by these defendants' violation of this statute as described hereinabove.

~~COUNT FOUR~~

~~(State and Federal Anti Trust, N.J.S.A. 56:9-3 and 15 U.S.C. § 1~~

~~Against all Defendants)~~

~~74.  Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.~~

~~75.  The Defendants contracted, combined or conspired together to ensure that ADNAS purchase microwire from ACS.~~

~~76.  The Defendants contracted, combined or conspired together to ensure that DEMOD received no funding in New York but that ADNAS did.~~

~~77.  At the time, ADNAS and ACS were competitors of DEMOD.~~

~~78.  The combination and conspiracy between the defendants produced adverse, anti-competitive effects within the market for microwire in the United States.~~

79.  The combination and conspiracy affected interstate commerce. As a result of the conspiracy, ADNAS moved from California to New York and a New Jersey company, DEMOD, was discriminated against in favor of a New York company, which ADNAS became.

80.  The object of the combination and conspiracy and the conduct undertaken pursuant to the combination and conspiracy unreasonably restrained trade. The object was to make ACS the sole supplier of microwire to ADNAS and to the marketplace in general and to ensure that ADNAS' competing track and trace and authentication technology was free from competition by DEMOD.

81.  DEMOD was injured as a proximate result of the combination and conspiracy.

82.  The available evidence, some of which is described in this complaint, tends to prove that the defendants had a conscious commitment to the common scheme of restraining DEMOD's business and supporting the business of ADNAS and ACS. This evidence includes but is not limited to:

   a. the fact that Mr. Brocklesby was separated from ADNAS shortly after he misrepresented to DEMOD that he had never heard of DEMOD and had elected to do business with ACS on the direction of a person from New York.

   b. At that time, Dr. Hayward on behalf of ADNAS, had already completed the acquisition of funds from the RF

41

and had substantially completed the negotiation of the
agreement to move ADNAS from California to New York.

c. Also at that time, Hayward was a member of the Board of
Directors of the RF along with Mr. Ecklin. Mr. Ecklin
owed fiduciary and other legal obligations to DEMOD at
the time by virtue of his roles at ATRI and Corning.

d. Also at the time, the Empire State Development
Corporation ("ESDC") denied DEMOD's request for a grant
while its director, Charles Gargano, held stock in
ADNAS.

e. Gargano and ESDC also administered the "Gen*NY*sis"
grant of approximately $3,000,000 to Alfred to establish
a biomaterials program to be run by Dr. Alan Goldstein.
Alfred never allocated these funds for the development
of a biomaterials program and instead allocated the
grant to a different program without any objection from
Mr. Gargano or ESDC. Dr. Goldstein was working with
DEMOD at the time and had the grant been allocated to
biomaterials as required, Dr. Goldstein would have
pursued research into the biomaterials applications of
microwire, including but not limited to the combination
of microwire and DNA replication technology.

f. The other evidence mentioned herein.

83.   As a result of the combination and conspiracy, ACS became the only company providing microwire for use in products sold in the United States. At the time, DEMOD had the right and ability to produce microwire that would have performed as well or better than the microwire acquired from ACS.

84.   In addition to producing actual and probable anticompetitive effects in New York and the United States, the conspiracy among the defendants alleged herein was per se illegal in that the defendants conspired, among themselves and with others, to boycott DEMOD and drive it from the market.

85.   DEMOD suffered an anti-trust injury in that as a result of the actions complained of, it was driven from the market leaving ACS as the only manufacturer of a glass coated amorphous metal microwire in the world. The damages suffered by DEMOD are described above.

### COUNT ~~FIVE~~FOUR

(BREACH OF CONTRACT AGAINST ALFRED)

~~86~~71.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~87~~72.    DEMOD entered into a written agreement with Alfred as described above.~~to advance and promote DEMOD's microwire technology. Robert Bitting accepted the Agreement on behalf of ALFRED on or about May 9, 2002 and the parties executed the written agreement in or about July of 2002. Pursuant to the~~

43

~~agreement, ALFRED agreed to pursue state and federal grants to advance DEMOD's microwire technology with the ultimate goal of enabling DEMOD to offer products for sale. DEMOD agreed to give ALFRED a one percent (1%) royalty on sales and to allow ALFRED to perform certain research on the microwire.~~ The agreement also contained terms requiring ALFRED to keep strictly confidential all information disclosed in the course of the relationship.

~~88~~73.    DEMOD and ALFRED maintained and ratified their contractual relationship at all times from the acceptance of the agreement detailed above, through the written modification of the agreement which took place on or about May 10, 2005 when Charles Edmonson, on behalf of Alfred, accepted terms proposed by DEMOD.

~~89~~74.    By engaging in the acts alleged above, and by failing to pursue state, federal and other funding for DEMOD, and by in fact assuring that DEMOD did not receive any such funding, Alfred breached the contract.

~~90~~75.    Many opportunities existed for Alfred to seek or support funding for work with DEMOD, but Alfred failed to do so. By way of example, Alfred refused to support a congressional appropriations request made by DEMOD because it conflicted with other undisclosed interests of ALFRED, which were not disclosed to DEMOD.

9176.      ~~Further, as described above,~~ ALFRED misdirected $3-$5 million dollars from its Biomaterials Center or "BIOS" program which was to be under the direction of Dr. Alan Goldstein. This money would have been used, in part, to develop DEMOD's technology. This misdirection of funds was a breach of the contract between ALFRED and DEMOD in addition to constituting the fraudulent use of dedicated state and federal money.

~~92.  ALFRED further breached the agreement by disclosing to CORNING and others information required to be kept confidential per the agreement.~~

77.      ALFRED further breached the agreement by failing to disclose that it had certain interest that conflicted with its obligations to DEMOD.

78.      ALFRED further breached the agreement by failing to advise DEMOD that its efforts to attract investment from New York State agencies were futile and by letting DEMOD "play out the string" with those agencies.

79.      ALFRED further breached the agreement by applying for one or more "bogus grants" in DEMOD's name and without DEMOD's knowledge.

80.      ALFRED further breached this agreement by directing Professor William LaCourse to not submit a Phase II SBIR proposal concerning an application for microwire after Phase I has been successfully received and performed.

45

~~93~~81.     DEMOD was damaged by Alfred's breach of contract as described above and in that DEMOD was relying upon Alfred's good faith performance to seek funding from government and other entities to create a manufacturing facility and prototypes. Due to the lack of funding and Alfred's dissemination of confidential information, DEMOD was prevented from establishing its business as a going concern towards which DEMOD had expended millions of dollars of funds.

~~94~~82.     The actions alleged herein against Alfred prevented DEMOD from recognizing the fruits of it contract with Alfred and therefore constitute a breach of the covenant of good faith and fair dealing inherent in every contract.

~~95~~83.      DEMOD has suffered natural and foreseeable damages as a result of Alfred's breach of contract and the covenant of good faith and fair dealing, as described above. Had Alfred fulfilled its contract, DEMOD would be a profitable going concern rather than the near total loss that it is. Further, had Alfred not breached its contract, monies expended by DEMOD to fulfill its contract with Alfred and to develop microwire into a commercial success would not have been spent without return.

**COUNT ~~SIX~~FIVE**

(Alfred and Corning's Liability for Claims Against ATRI/Piercing

the Corporate Veil)

96 84.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

97.  Corning and Alfred were and remain the only two partners and owners of ATRI. Corning and Alfred were and are responsible for the operation of ATRI.

85.    ATRI was co-founded by Corning and Alfred pursuant to a partnership agreement between them. Thus, from the very inception of ATRI, it was never an independent corporation but was an instrumentality of Alfred and Corning.

98 86.    Corning and Alfred exercised pervasive complete dominion and control over ATRI from its inception as described above including the allegations of paragraph 35. Employees of both Corning and Alfred simultaneously served as the management of ATRI. There was substantial intermingling of activity at ATRI as most of the space at the CCIC was occupied by companies owned by the defendants or their employees or related corporate entities.

87.    Corning and Alfred used their domination and control of ATRI to perpetrate a fraud or wrong upon Demodulation. Specifically, these defendants arranged for and permitted DEMOD to locate its business at ATRI and to keep its business at ATRI so they could monitor and control DEMOD while they were both working on projects to produce competing technology. As they were doing this, they knew DEMOD's attempts to secure investment

or grants from the State of New York would be futile but never
informed DEMOD of this fact. For example, while DEMOD was at
ATRI under the belief that ATRI was a legitimate, independent
business incubator, Corning was working with AMT, Texas
Instruments, Dow Corning, and Matrices to develop a microwire
RFID application in violation of Corning confidentiality
agreement with DEMOD.

99.   ATRI was used by these Defendants to perpetrate the acts
described herein and to damage DEMOD as described herein.

10088.   Should ATRI be found liable for any damages asserted
herein, Alfred and Corning are jointly and severally liable for
those damages.

### COUNT ~~SEVEN~~SIX

(BREACH OF CONTRACT AGAINST ATRI)

10189.   Plaintiff repeats and re-alleges the foregoing
paragraphs as if fully set forth at length herein.

10290.   DEMOD entered a verbal contract with ATRI pursuant to
which DEMOD occupied space and conducted some of its business
operations at the CCIC. Pursuant to this contract, ATRI and
DEMOD agreed that DEMOD would receive all the benefits offered
by CCIC to start-up businesses. ATRI breached the contract by
failing to provide these benefits and services to DEMOD.

91.      ATRI breached the contract by taking the actions and
committing the wrongs alleged above.

92.      ATRI further breached the contract by consenting to its domination and control by Corning and Alfred, as described above.

93.      ATRI breached the contract by failing to treat its tenants equally. For example, ATRI spent at least $5,000,000 to benefit Corning but spent nothing to benefit DEMOD.

94.      ATRI lured DEMOD into the CCIC by making misrepresentations of fact. For example, ATRI advertised that it had created thousands of jobs and billions of dollars in revenue when it knew that was not true. DEMOD relied upon these representations in deciding to locate its operations at the CCIC.

95.      ATRI received consideration from DEMOD in that DEMOD's tenancy permitted ATRI to fulfill its charter and obligations to the State of New York to locate and incubate emerging start-up companies.

96.      In addition, DEMOD and ATRI entered into a written non-disclosure agreement. DEMOD disclosed confidential information to ATRI pursuant to this agreement including technological information concerning RFID and business plans. ATRI breached this agreement by disclosing this information to third parties.

103.      The CCIC was a New York state funded initiative to encourage and support private companies working in the field of ceramics.

104.      ATRI breached the contract by failing to provide the promised benefits and services to DEMOD and by taking the actions described herein. Contrary to its duties under the contract, ATRI disseminated false information about DEMOD and ensured that DEMOD did not receive any available funding.

105.      ATRI lured DEMOD into the CCIC under false pretenses for the purpose of extracting information from DEMOD.

~~106~~97.     The actions alleged herein against ATRI prevented DEMOD from recognizing the fruits of it contract with ATRI and therefore constitute a breach of the covenant of good faith and fair dealing inherent in every contract.

~~107~~98.      DEMOD was damaged by ATRI's breach of contract as described hereinabove. Had ATRI not breached its contract, DEMOD would have been a commercial success.

**COUNT ~~EIGHT~~SEVEN**

(BREACH OF CONTRACT AGAINST CORNING)

~~108~~99.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~109~~100.    DEMOD entered one or more contracts with Corning requiring CORNING to keep confidential all information

~~concerning DEMOD and its technology.~~described in paragraph 22 above.

~~110~~101.     CORNING breached the contract by ~~sharing DEMOD's information with others, including but not limited to ACS.~~jointly developing a microwire RFID application with AMT, Texas Instruments, Dow Corning and Matrices. The technological basis for this application was first disclosed to Corning by DEMOD pursuant to the confidentiality agreement between Corning and DEMOD. This joint development project was managed in whole or in part by Mark Taylor of Corning, the same person who was responsible for Corning's confidentiality agreement with DEMOD. In the course of this joint development project, Corning disclosed DEMOD's confidential information to the other companies involved in the joint development project.

102.     DEMOD first learned of the joint development project referred to in the previous paragraph in the summer of 2013. Between January 2005 and the present, Corning took affirmative steps to prevent DEMOD from learning of this breach including assurances from Vincent Hatton in January and February of 2005 that no such joint development project was underway and assurances from Robert Ecklin in the summer of 2004 that Corning had no interest in developing microwire technology.

111.      Corning further breached the contract by attempting toreverse engineer DEMOD's trade secrets and sharing the results of that reverse engineering with others, including ACS.

112.  CORNING further breached the contract by actively undermining DEMOD by spreading false information about DEMOD, its technology and other intellectual property. By way of specific example and not limitation, Corning, through its employees or other agents including Robert Ecklin and Tom Trantor, stated that Corning was the true owner of DEMOD's technology and that DEMOD had stolen the technology from Corning.

113.      According to information provided to DEMOD by Erland Kailbourne, Corning used its political and commercial influence to ensure that DEMOD's technology would not find funding, an interested partner, lender or customer in New York State. DEMOD also learned in meetings with other New York State grant making bodies that they would not consider a grant to DEMOD without the approval of Corning because it was their understanding that Corning was not supportive of DEMOD. Such bodies included the ESDC, NYSTAR and the New York State Energy Research and Development Authority ("NYSERDA").

114103. The actions alleged herein against Corning prevented DEMOD from recognizing the fruits of it contract with Corning

and therefore constitute a breach of the covenant of good faith and fair dealing inherent in every contract.

~~115~~104.    DEMOD was damaged by Corning's breach of contract as alleged hereinabove and in that ~~it was prevented from bringing its technology to market and becoming a commercial success.~~the confidential information revealed by Corning to AMT, Texas Instruments, Dow Corning and Matrices has been used by one or more of them to generate revenue that rightfully belongs to DEMOD.

~~**COUNT NINE**~~

~~(TRADE LIBEL AGAINST CORNING)~~

~~116.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.~~

~~117.    ECKLIN was on the board of RF while at the same time serving as Executive Vice President of Corning and the Director of the CCIC. In all those positions, Ecklin was acting in furtherance of his duties to his employer, Corning.~~

~~118.    While serving in this capacity, Ecklin made the statements described above.~~

~~119.    Similarly, Tom Trantor was acting in his capacity as Corning's government relations executive when he made the statements described above.~~

120.     DEMOD learned in 2006 from Mr. Iszard of the statements made by Corning representatives to the ESDC, as described above.

121.     Based on the comments that DEMOD heard from ESDC, NYSTAR and NYSERDA, Corning must have made further statements to harm DEMOD's ability to develop its business.

122.     DEMOD was damaged by these statements, as described above, in that its ownership of its technology was called into doubt making those that heard the statements unwilling to do business with or financially support DEMOD.

**COUNT ~~TEN~~EIGHT**

(MISAPPROPRIATION OF TRADE SECRETS AGAINST CORNING, ALFRED, ADNAS and ATRI)

~~123~~105.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~124~~106.   These defendants each misappropriated Plaintiff's trade secrets, conspired to misappropriate them, or knowingly received misappropriated trade secrets and gave them to others~~,~~ ~~including ACS,~~ not entitled to receive them. ~~These trade secrets were then used by ACS and ADNAS in their business.~~For example, Alfred used DEMOD's trade secrets to apply for a federal grant and Corning used them to jointly develop with AMT, Texas Instrument, Matrices and Dow Corning a microwire RFID application.

~~125~~107.   DEMOD was damaged thereby, as described above.

**COUNT ~~ELEVEN~~NINE**

(UNFAIR COMPETITION/TORTIOUS INTERFERENCE WITH PROSPECTIVE

BUSINESS RELATIONS AGAINST CORNING, ALFRED and ATRI)

~~126~~108.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~127~~109.   These Defendants each took actions or conspired to take actions to prevent DEMOD from doing business with or getting grants or loans from third parties. By way of example and not limitation, these defendants assured that DEMOD did not do business with ADNAS.

110.   By way of further example, Corning and Alfred assured that DEMOD did not receive support from Amo Houghton's Task Force on the Future. Mr Houghton was a former congressman and the former Chairman and CEO of Corning and formed the Task Force on the Future to coordinate and foster economic development in southwestern New York.

~~128~~111.   As a result of these actions, DEMOD was not able to realize its reasonable expectations of economic advantage, as described above, which expectation was in fact recognized in writing by Alfred to have been in the range of $250,000,000 to $2,000,000,000 annually.

**COUNT ~~TWELVE~~TEN**

(NEW YORK GENERAL BUSINESS LAW §§ 349 and 350 AGAINST ATRI)

~~129~~112.        Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

~~130~~113.        ATRI engaged and continues to engage in deceptive acts and practices described above in the conduct of the business of the CCIC which were and are directed towards consumers of business incubation services.

~~131~~114.        At the time DEMOD contracted with ATRI to set up part of its operations there and continuing through the present, CCIC marketed itself and offered its services to the general public. ATRI has attempted to attract small family businesses to the CCIC and other small start up technology ventures.

~~132.        DEMOD was directly injured by these deceptive acts and practices, including but not limited to the false statements in the documents filed with NYSTAR described herein and the false advertising described herein.~~

115.    DEMOD was directly injured by these deceptive acts and practices. These deceptive acts and practices induced DEMOD to locate its business at the CCIC thereby inducing DEMOD to forego other legitimate opportunities to locate its business elsewhere.

116.    The public at large has been injured by these deceptive acts and practices in that state and federal tax

56

revenue was provided to ATRI by the government of the State of New York for the express purpose that it be used and held in trust for the benefit in start-up businesses intended to benefit the public and start-up businesses by creating revenue and jobs. Rather than using the funds for this purpose, ATRI used at least $5,000,000 of these funds to benefit Corning, then an existing public corporation for at least one hundred years, by building it a laboratory and clean space to operate it photonics business.

133117.    Had DEMOD known that the CCIC was operated as a sham to promote the interests of its ownersCorning and Alfred rather than emerging businesses, it would not have become associated with the CCIC in any way and would not have suffered the damages asserted hereinabove.

**COUNT THIRTEEN**

**(42 U.S.C. § 1983 AGAINST ATRI)**

134.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

135.    The State of New York significantly involved itself with ATRI. It provided the initial funding of $10,000,000 to operate and create the CCIC and it passed special legislation cancelling ATRI's responsibility to pay back some portion of that initial funding, believed by DEMOD to be approximately $5,000,000.

136.    While acting under the color of state law, policy or custom, ATRI acted to deprive DEMOD of rights guaranteed to it by the United States Constitution including but not limited to the substantive due process right of property ownership and the right to engage in commercial activity.

137.    The actions of this Defendant also violated the Commerce Clause in that those actions amounted to a control over interstate commerce and the discriminatory treatment of DEMOD, a New Jersey company, in favor of New York companies such as Corning and ADNAS.

138.    The actions of this defendant were consistent with a policy or custom observed by this defendant.

139.    DEMOD suffered damages as alleged hereinabove.

**COUNT FOURTEEN**

(35 **U.S.C.** § 271 - PATENT INFRINGMENT AGAINST ADNAS)

140.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

141.    Demodulation holds or held several patents. The patents at issue are: US 6,270,591 B2 - Amorphous and Nanocrystalline Glass-Covered Wires; US 5,557,085 - Method and Device for Electronic Identification; US 5,576,693 - Method and Device for Remote Sensing of Objects; US 6,018,297 - Method and Device for Coding Electronic Labels; US 6,137,411 - Article Surveillance System; US 6,225,905 - Sensor for Remote Detection

58

of Objects; US 6,232,879 – Sensor and Method for Remote
Detection of Objects; US 6,417,771 – Sensor, a Method and a
System for Remote Detection of Objects; US 7,075,439 – Marker
for Remote Detection of Articles; US 7,071,417 B2 – Optically
Encoded Glass-Coated Microwire; US 7,233,249 – Multi-Bit Encoded
Glass-Coated Microwire and Articles Composed Thereof; US
7,354,645 – Engineered Glasses for Metallic Glass-Coated Wire;
US 7,368,166 – Polymerase Chain Reaction Using Metallic Glass-
Coated Microwire.

142.      During the period when these patents were held by
Demodulation, and within the six year period preceding the
initiation of this lawsuit, including through the present for
some of the patents, this defendant infringed one or more of
DEMOD's patents by producing, selling, marketing and using
products that either literally infringed DEMOD's patents or did
so through the doctrine of equivalents.

143.      DEMOD gave ADNAS written notice of infringement. In
response, ADNAS claimed it was going to cease and desist in the
infringement. However, this representation was false as ADNAS
continued to infringe after that date as evidenced by the
presentation to Far East.

144.      DEMOD suffered damages as a result of this
infringement as it was entitled to the revenue derived by ADNAS

as a result of its sale of infringing products and as described
above.

**COUNT ~~FIFTEEN~~ELEVEN**

(FRAUD AGAINST ALFRED, CORNING AND ATRI)

~~145~~118.   Plaintiff repeats and re-alleges the foregoing
paragraphs as if fully set forth at length herein.

~~146~~119.   These defendants knowingly made material
misrepresentations or omissions of fact with the intent to cause
DEMOD to rely upon them and upon which DEMOD actually relied.
These misrepresentations included:~~defraud DEMOD.~~

　　a. Corning's written statements by Vincent Hatton to DEMOD
　　　　in January and February of 2005 that Corning was not
　　　　involved in any activity that would constitute a breach
　　　　of the confidentiality agreement between Corning and
　　　　DEMOD. At the time, Corning knew it was involved in a
　　　　joint development project for a microwire RFID
　　　　application with AMT, Texas Instrument, Dow Corning and
　　　　Matrices which project was being managed by Mark Taylor,
　　　　the same Corning employee responsible for the non-
　　　　disclosure agreement with DEMOD. These written
　　　　statements also contained the knowing misrepresentation
　　　　that Hatton had spoken to Mark Taylor, Dr. Borelli and
　　　　others to determine whether any breach of the
　　　　confidentiality agreement had occurred when in fact no

such conversations took place. DEMOD first learned in the summer of 2013 that these statements were knowingly false.

b. Robert Ecklin's statement to DEMOD in the summer of 2004 that Corning had no interest in developing any applications for microwire technology when in fact it was at that very time involved in a joint development project for a microwire RFID application with AMT, Texas Instruments, Dow Corning and Matrices. At the time, Ecklin was an executive with Corning and the President of ATRI and made this statement on behalf of both corporations. DEMOD first learned in the summer of 2013 that this statement was knowingly false.

c. Alfred's repeated statements by Robert Bitting, Mike Hyde, Dave Szerbacki and others to DEMOD that Alfred was pursuing grants and other funding from New York State agencies for the benefit of DEMOD when in fact it was not doing so because it knew those efforts would be futile. Alfred decided to let DEMOD "play out the string" in pursing this funding and did not disclose that those efforts were futile under circumstances where it had an obligation to do so because Alfred knew DEMOD was relying upon Alfred's assistance and advice to obtain such funding.

147120.   DEMOD relied on those misrepresentations to its detriment thereby incurring and suffering damages described hereinabove.

COUNT SIXTEEN

(UNJUST ENRICHMENT AGAINST ALFRED)

148.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

149.     Alfred promised to seek funding to be used to develop DEMOD's business. Alfred, or one or more entities under its responsibility and control, obtained funding based on the representation that it would be used for work with DEMOD.

150.     Alfred never made that funding available to DEMOD and instead retained it for its own purposes.

151.     The circumstances are such that it would be unfair and inequitable to permit Alfred to retain the funding.

**COUNT SEVENTEENTWELVE**

(BREACH OF FIDUCIARY DUTY AGAINST ATRI)

152121.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

153122.   ATRI owed fiduciary duties to DEMOD in the ATRI obtained at least $10,000,000 in funds from the New York State government on the condition that those funds be used for the benefit of independent start-up companies like DEMOD. In this

respect, ATRI accepted the obligation to act as a trustee over those funds.

123.    ATRI acknowledged its fiduciary obligations to its tenants by advertising that its charter was to provide assistance to start-up companies without charge.

124.    ATRI acknowledged its fiduciary obligations to DEMOD by accepting DEMOD into the CCIC without charge and by telling DEMOD that its mission was to assist start-up companies like DEMOD because it had received government funds to do so.

~~154~~125.    ATRI breached those fiduciary duties which proximately caused DEMOD to suffer the damages alleged hereinabove. Specifically, ATRI breached its fiduciary duty to DEMOD by:

   a. Failing to provide "intellectual property management," "investment/strategic partner linkages," "links to higher education institutions," "international trade assistance," "general legal services," and "technology commercialization" and other services;

   b. Failing to advise DEMOD that ATRI was actually operated at the direction of Corning and Alfred, who had formed a partnership to establish, capitalize and operate ATRI for their own benefit;

   c. Failing to advise DEMOD that Corning was involved in a joint development project for a microwire RFID application with AMT, Texas Instruments, Dow Corning and

Matrices utilizing DEMOD's ideas which was in direct illegal competition with DEMOD;

    d. Spending at least $5,000,000 on one of its tenants, Corning's photonics business, leaving insufficient other tenants such as DEMOD.

**COUNT EIGHTEEN**

(BREACH OF CONTRACT IMPLIED IN FACT AND/OR LAW AGINST ATRI)

126.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth at length herein.

127.    Through their actions and inactions, ATRI and DEMOD indicated and intention to be bound to a contract between them. The essential consideration between them was that DEMOD agreed to become a tenant at the CCIC and ATRI agreed to provide DEMOD the services offered to CCIC tenants. ATRI received a benefit in that DEMOD's tenancy permitted ATRI to fulfill its charter to incubate ceramics companies.

128.    ATRI breached this contract by failing to provide the services offered to CCIC tenants.

**WHEREFORE,** Plaintiff demands judgment against each Defendant individually, jointly, severally and/or collectively as follows:

    (a) Compensatory Damages;

    (b) Consequential and incidental damages;

    (c) Punitive Damages;

    (d) Attorneys ' fees and costs of suit; and

(e) Interest;

(f) Treble damages;

(g) An injunction prohibiting ADNAS from further infringement;

(~~h~~g) An order reinstating any patents which have expired due to the non-payment of applicable fees;

(~~f~~h) Awarding such other and further relief as the Court may deem equitable, proper and just.

**JURY DEMAND**

Plaintiff hereby demands trial by a jury on all issues.

BY:

Benjamin D. Light, Esq.

Dated: