UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**DEMODULATION, INC.,**

       **Plaintiff,**

   v.

**CORNING INC.,** *et al.***,**

       **Defendants.**

Civ. No. 2:11-cv-00296 (WJM)

**OPINION**

### WILLIAM J. MARTINI, U.S.D.J.:

Plaintiff Demodulation, Inc. ("Demod") brings this action against three Defendants: (1) Corning Inc. ("Corning"); (2) Alfred University (the "University"); and (3) Alfred Technology Resources, Inc. ("ATRI"), raising, *inter alia*, breach of contract claims, misappropriation of trade secrets claims, and claims under the federal and state Racketeer Influenced and Corrupt Organizations Act ("RICO") statutes.

This matter comes before the Court on the Defendants' three separate motions for summary judgment. Plaintiff's counsel has also moved, more than five months after briefing in this case was completed, to stay proceedings and withdraw as counsel. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Corning's motion is **GRANTED**; the University's motion is **GRANTED** and ATRI's motion is **GRANTED**. Plaintiff's Complaint is **DISMISSED**. Plaintiff's counsel's motion for a stay and to withdraw as counsel is **DENIED as moot**.

### I.    RELEVANT BACKGROUND

The Court writes for the benefit of the parties, and assumes familiarly with the underlying facts and procedural history, as described in detail in this Court's previous opinions.[1] The Court has omitted facts irrelevant to the claims presently before it.

#### A.  Undisputed Facts

The following facts are undisputed unless otherwise noted, and are drawn from Plaintiff's Second Amended Complaint ("SAC") and documents submitted in connection

---

[1] *See* ECF doc. 179 (June 2014 Opinion); *Demodulation, Inc. v. Applied DNA Sciences, Inc.*, No. 2:11-CV-00296, 2012 WL 6204172 (D.N.J. Dec. 12, 2012).

1

with the pending motions for summary judgment. In establishing relevant dates, the Court relies entirely upon Plaintiff's SAC, Plaintiff's "timelines," and Plaintiff's contemporaneous notes, which were all produced during discovery.

### The Parties and Their Relationships

Plaintiff Demod is a New Jersey technology start-up company. ECF doc. 186 (SAC) ¶¶ 1, 8. Defendant University is a private university located in Alfred, New York. *Id.* ¶ 4. Defendant Corning is a New York corporation. *Id.* ¶ 3. Robert Ecklin was an Executive Vice President at Corning and the President of Defendant ATRI. *Id*. ¶ 35.

Defendant ATRI is a non-profit joint venture between Corning and the University, also located in Alfred, New York. *Id.* ¶¶ 5, 18. ATRI was established with the help of grants from the New York State government, and is a "business incubator" that helps start-up companies develop and market emerging ceramics-related technology. *Id.* ¶ 20. In furtherance of this goal, ATRI owns and operates the Ceramics Corridor Innovation Center (the "CCIC"). *Id.* The CCIC advertises that companies "under its care" (*i.e.*, CCIC tenants) can take advantage of services, including "intellectual property management," "investor/strategic partner linkages," "international trade assistance," and "technology commercialization." *Id.* ¶ 20. In addition to co-owning ATRI, Defendant Corning is also a CCIC tenant, and receives the benefits described above.

In 2001, Plaintiff Demod was formed by James O'Keefe for the purpose of manufacturing and commercializing its patent rights to a type of microwire. SAC ¶¶ 8-9. Microwire is a high-tech hair-like fiber that can detect and transmit information. *Id*. In addition to its microwire patents, Plaintiff also owned certain trade secrets related to microwire, such as business plans and means for altering microwire signals. *Id*. ¶¶ 12-13. Dr. Wesley King was Plaintiff's Operations Manager from 2004-2008, and owns 5% of Demod. ECF doc. 256 (Bevelock Decl.), Ex. F.

On July 1, 2002, Plaintiff entered into a "Memorandum of Understanding" ("the MOU") with the University to commercialize its microwire. Bevelock Decl., Ex. K ("MOU"). The MOU provided that the University would receive a 1% royalty on all gross revenue recognized from the eventual sale of microwire products, in exchange for the University's efforts to obtain state and federal funding for Plaintiff's microwire project. *Id*. ¶ 1. The MOU had a termination date of December 31, 2003, but contained a confidentiality provision which survived termination. *Id*. ¶¶ 5, 7, 10. The MOU specified that any modification to the parties' agreement "shall be effective only if in writing and signed by the parties." *Id*. ¶ 12.

The University subsequently invited Plaintiff to work out of its CCIC, managed by ATRI. SAC ¶ 18. In 2003 or 2004, Plaintiff accepted this offer and moved into the CCIC. *Id.* ¶ 19; ECF doc. 254 (Flinn Decl). Ex. H, at 416-20. The parties dispute the nature of this occupancy: Plaintiff contends that its acceptance of the University's

invitation created a "contract," by which ATRI was bound to provide Plaintiff with the services it furnishes to its other tenants, including assistance in gaining access to federal and state funding. SAC ¶¶ 18-22. ATRI disputes this characterization, arguing that Plaintiff was not a tenant because it did not have a lease or pay rent. Plaintiff further contends that, in 2003, ATRI and Plaintiff entered into a non-disclosure agreement ("NDA"), which required ATRI to hold in confidence all confidential information revealed to it by Plaintiff. SAC ¶¶ 19. ATRI contests this fact, stating that no NDA was ever signed. Plaintiff has submitted a copy of an unsigned NDA between the parties, dated June 12, 2003.

In 2004, Plaintiff apparently entered into an NDA with Corning. ECF doc. 266-1 (O'Keefe Decl.) ¶ 5. The NDA states that Corning shall hold Plaintiff's "Confidential Information" in confidence. *Id.*

Meanwhile, in May 2005, King (Plaintiff's Operations Manager) sent an email to the president of the University, Charley Edmonson, with the subject line "revised version of 'new MOU.'" ECF doc. 256 (Bevelock Decl.) Ex. O. In the email, King stated that he looks "forward to even more fruitful interactions with [the University]." King attached a file containing "changes [he] made to the original set of talking points [the two had] reviewed earlier today" and asked Edmonson to "review it to make sure [King had] captured accurately [Edmonson's] suggestions." The attached file is an unsigned MOU between Plaintiff and the University.

Plaintiff moved out of the CCIC in 2008. Sometime between late 2008 and early 2009, Plaintiff ceased all efforts to develop its microwire technology and moved its equipment into storage. Bevelock Decl., Ex. X. In the present action, Plaintiff blames Defendants for its downfall: it contends that Defendants conspired to deprive Plaintiff from receiving state and federal funding, and diverted their resources to securing funding for Corning instead. Plaintiff further alleges that Defendants misappropriated Plaintiff's trade secrets and confidential information relating to microwire for their own financial gain. SAC ¶¶ 24-39. Defendants deny these allegations and contend that they made their best efforts to secure state and federal funding on Plaintiff's behalf and assist Plaintiff in its microwire development efforts.

**Timeline of "Interferences"**

During discovery, Plaintiff provided Defendants with evidence of its theory of the case, mapped out in timelines of "interferences", notes, correspondence, and relationship charts. Below is a chronological compilation of the events relevant to Plaintiff's pending claims:

- **October 29, 2001**: Plaintiff held discussion with the CCIC about its microwire technology. The CCIC's executive director John Wilder brought in a Corning consultant and, at that time, O'Keefe had "suspicions of Corning control and influence at the CCIC." Walsh Decl., Ex. C (Pl.'s

Timeline).

- **Summer 2004**: Robert Ecklin, in his position as a Corning and ATRI representative, fraudulently represented to Plaintiff that Corning had "no interest" in microwire technology, "when in fact [Corning] was at that very time involved in a joint development project for a microwire RFID application." SAC ¶ 107.

- **July 2004**: O'Keefe believed that Robert Ecklin, who "as director of [the CCIC] was responsible for helping companies," intended to "destroy [Plaintiff] and that "Ecklin personally and Corning as a whole ha[d] an intrinsic conflict of interest in running of new company/technology incubator centers" in that "[t]hey have no interest in fostering new business creation outside the confines of their own companies and personal balance sheets." Pl. Timeline.

- **October 8, 2004**: King "spoke with a former employee of Corning" who "informed [him] of a conversation they had in which they learned that Corning Inc. is involved in research + development related to glass-coated wire. Specifically, they learned that Corning is working with an Israeli company on glass-coated silver wires . . . . This application was disclosed to Corning by DEMOD, as was the smooth surface resulting from our process." Walsh Decl. Ex U (King's handwritten notes).

- **Sometime in 2004**: Plaintiff "learn[ed] that Corning has embedded itself in the [New York State] political structure" and that "despite [its] repeated efforts to obtain grants . . . [Plaintiff is] denied [grants] but Corning receives $16 million approximately." Plaintiff was also "advise[d] to be cautious of [the University]" because the University "pulled . . . federal monies away from [] research" and "they were committing fraud." Pl. Timeline.

- **January 9, 2005**: Plaintiff sent a letter to the Corning stating that Corning had breached the NDA by disclosing Plaintiff's confidential information to third parties, and conducting "on-going development efforts related to [microwire]." Walsh. Decl. Ex. W (Letter). According to Plaintiff, this letter "spell[ed] out that Ecklin did damage to [Plaintiff's] efforts and that [Corning] is in violation of [Plaintiff]'s patents." Pl. Timeline.

- **January 19, 2005**: Corning Senior Vice-President and Director of the Legal Department Vincent Hatton responded to Plaintiff's letter. Hatton stated that he had uncovered no indication of wrongdoing or breach of the

4

NDA.  O'Keefe Decl., Ex. A-3 (PA 124).

- **January 24, 2005**: O'Keefe sent an email to Hatton, which stated "for your clarification" and had a signed letter attached.  In the attached letter, Plaintiff referenced his January 9, 2005 correspondence, and noted that he wished to help Hatton "understand the gravity of the problem confronting our two organizations."  Plaintiff then described several events, including Corning's ongoing development of microwire, stating that "[t]his does indeed violate our NDA."  Near the end of his letter, O'Keefe states that "my team and I have been hurt by these actions."  Walsh Decl. Ex. LL.

- **February 14, 2005**: Hatton responded to Plaintiff's January 24, 2005 letter by writing to Plaintiff's counsel.  Hatton reiterated that Corning had no evidence to suggest a violation of the NDA.  SAC ¶ 107.

- **June 19, 2006**: Plaintiff filed complaints with several federal and New York state agencies (including the New York Attorney General's office, Comptroller's Office, and Inspector General's Office) requesting that they conduct a criminal investigation into Defendants' "misuse of federal and state funds," misappropriation of trade secrets, and sabotaging of Plaintiff's efforts to gain funding.  In its 31-page detailed letter to the Attorney General's office, Plaintiff stated that, if its concerns about the "collaborations" between the three Defendants was correct, "the sum of these actions amounts to a conspiracy."  Walsh Decl. Ex. L; Pl. Timeline.

- **2007**: Kathy Wise at NYSTAR (New York State's Division of Science Technology and Innovation) "gets fired after sending [Plaintiff] an email" indicating that NYSTAR mistakenly believed Plaintiff was helping fund a research project at the CCIC.  Pl. Timeline.

### B. Procedural Background

Plaintiff filed this action on January 18, 2011.  ECF doc. 1.  In December 2012, the Court dismissed all but three counts of Plaintiff's First Amended Complaint ("FAC"). *Demodulation, Inc. v. Applied DNA Sciences, Inc.*, No. 11-cv-00296, 2012 WL 6204172, at *13 (D.N.J. Dec. 12, 2012).  In doing so, the Court noted that, because "the [FAC] is a morass of disjointed vignettes with no clear chronology and very few dates," it could not "make statute of limitations determinations at [that] time." *Id.*

The Court permitted limited discovery on the issue of statute of limitations.  Corning then moved for summary judgment on the remaining claims against it on statute of limitations grounds; Plaintiff cross-moved for leave to file an SAC.  ECF docs. 132, 140.  This Court granted Corning's motion for summary judgment, but also partially

granted Plaintiff's motion to amend its Complaint. ECF doc. 179. Corning argued that the claims in the proposed SAC were time-barred, but the Court stated that it was "unable to make the necessary statute of limitations determinations based solely on the [SAC]," and Corning could "re-raise its statute of limitations arguments later in the litigation." *Id*. at 13, n.2.

In its SAC, Plaintiff raises the following nine causes of action against Defendants:

(1) Count 1 – NJ Civil RICO (NJSA 2C:41-2(c)) against all Defendants;
(2) Count 2 – NJ RICO Conspiracy (NJSA 2C:41-2(d)) against all Defendants;
(3) Count 3 – Federal Civil RICO (18 U.S.C. § 1962(c)) against Corning and the University;
(4) Count 4 – Breach of Contract against the University;
(5) Count 6 – Breach of Contract against ATRI;
(6) Count 7 – Misappropriation of Trade Secrets against the University and ATRI;
(7) Count 8 – Unfair Competition against the University and ATRI;
(8) Count 9 – Fraud against Corning and ATRI; and
(9) Count 10 – Breach of Implied Contract against ATRI.

SAC at 15-36.[2] After discovery concluded, each of the three Defendants separately moved for summary judgment, arguing that Plaintiff's claims against them are time-barred and meritless. ECF docs. 248, 253, 256 (Motions).

In August 2016, Plaintiff's counsel moved for a stay of proceedings and to withdraw as counsel. ECF doc. 298. Plaintiff's counsel explained that he had received instructions from Plaintiff that he considered "repugnant, which [he has] a fundamental disagreement and that would cause a violation of the Rules of Professional Conduct." *Id*.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court considers the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor. *Bowers v. NCAA*, 475 F.3d 524, 535 (3d Cir. 2007). A defendant is entitled to summary judgment on statute of limitations grounds where there is no genuine dispute of material fact as to when the limitations period began to run, and based on that accrual date, the defendant is entitled to judgment as a matter of law. *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004); *see also* Fed. R. Civ. P. 56(a).

---

[2] Plaintiff has voluntarily withdrawn Count 5 of its SAC entirely, and Count 9 as to the University. ECF doc. 249, 28.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* The opposing party must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, to withstand a proper motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57.

## III. DISCUSSION

### A. RICO Claims Against All Defendants (Counts 1, 2, 3)

In Counts 1 through 3 of the SAC, Plaintiff alleges that Defendants violated federal and New Jersey civil RICO statutes. The basis for Plaintiff's RICO claims is Defendants' "overall pattern" of using federal and state funds given to the CCIC (the "RICO Enterprise") for Defendants' own benefit, instead of using that money as it was intended, *i.e.*, to benefit Plaintiff. SAC ¶ 51. Defendants argue that Plaintiff's RICO claims are time-barred. The Court agrees.

Because the federal and New Jersey RICO statutes "are intended to be coextensive," claims arising under both statutes may be analyzed concurrently. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012). A four-year statute of limitations period applies to both federal and New Jersey civil RICO claims. *Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000) (federal RICO claims); *Cetel v. Kirwin Fin. Grp.*, 460 F.3d 494, 509-10 (3d Cir. 2006) (New Jersey RICO claims). The limitations period begins to accrue when plaintiff knew or should have known of its injury. *Prudential Ins. Co. of Am. v. Nat'l Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004) (federal RICO claims); *Slimm v. Bank of Am. Corp.*, Civ. No. 12-5846, 2013 WL 1867035, at *19 (D.N.J. May 2, 2013) (New Jersey RICO claims).

Here, Plaintiff's RICO claims accrued no later than June 2006, when Plaintiff sent its letter to federal and state agencies requesting that they conduct a criminal investigation into Defendants' potential "conspiracy" to deprive Plaintiff of federal and state funding. Walsh Decl. Ex. L. That letter conclusively establishes that Plaintiff knew of its RICO claims by that date. *See Prudential*, 359 F.3d at 233. Plaintiff's RICO claims in this action – not filed until more than five years later, in January 2011 – are, therefore, time-barred.

Plaintiff apparently concedes that its RICO claims against Defendants that existed before January 18, 2007 (four years before date this action was filed) are time-barred. ECF doc. 266 (Corning Opp.) at 16. But Plaintiff argues that the "separate accrual rule"

saves its post-January 2007 RICO claims because "several watershed moments" occurred after January 2007 that "revealed the nature, scope and possible actions being taken against [Plaintiff] by the Enterprise." *Id*. at 9, 16. This argument does not hold water. "[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). And claimants may not "recover for injuries outside of the limitations period by 'bootstrapping' them onto a later and independent predicate act." *Prudential*, 359 F.3d at 233 (3d Cir. 2004) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997)). Here, Plaintiff has not pointed to any distinct injury from predicate acts occurring after January 2007 that caused it "harm over and above the harm that the early acts caused." *Klehr*, 521 U.S. at 190. Accordingly, summary judgment is granted as to Counts 1 through 3.

### B.  Breach of Contract Claim Against the University (Count 4)

In Count 4, Plaintiff alleges that the University breached its contract with Plaintiff (the MOU) by, *inter alia*, failing to seek funding for Plaintiff and disclose conflicts of interest. SAC ¶¶ 75-80. The University maintains that Count 4 is time-barred. The Court concurs.

Pursuant to the MOU's choice of law provision, New York law applies to any dispute arising under the MOU. ECF doc. 256 (Bevelock Decl.), Ex. K (MOU) ¶ 11. The statute of limitations for breach of contract in New York is six years. 6 N.Y. C.P.L.R. § 214. "[I]n New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered." *ABB Indus. Sys. v. Prime Tech.*, 120 F.3d 351, 360 (2d Cir. 1997).

The MOU (the contract) between Plaintiff and the University expired on December 31, 2003. MOU ¶ 5. Therefore, the statute of limitations as to any claim arising under the MOU accrued by December 31, 2009, which is two years before the present action was filed. *See Park Ave. Consulting Grp. v. Newgold, Inc.*, No. 08-cv-1850, 2008 WL 4386766, at *1 (S.D.N.Y. Sept. 23, 2008) (breach of contract claim accrues when contract expires by its own terms). Accordingly, Count 4 is time-barred.

Plaintiff argues that Count 4 is not time-barred because the May 2005 "new MOU" email either constituted a modification of the July 2002 MOU or created a new contract between the parties. But according to the MOU's terms, any modification to the original MOU had to be memorialized in a signed writing, and Plaintiff does not contend that there was any such writing. The "new MOU" email also cannot constitute a new, binding contract: the attached draft MOU explicitly states that the draft MOU is not "meant to cover all aspects" of the parties' relationship, and details "must be agreed to and preserved in a formal executed document." Bevelock Decl. Ex. O. The draft MOU is not signed by either party, and Plaintiff has not produced a signed copy of a new contract. *See, e.g., Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 22

(2d Cir. 2011) (finding that "unsigned draft agreements exchanged between the parties do not reflect the existence of a verbal agreement that was to continue indefinitely"). Finally, Plaintiff does not contend that this draft MOU was ever signed: instead, O'Keefe testified that no agreement was reached, stating, with respect to the draft 2005 MOU, "[w]e never contracted with [the University]." Ex. F (O'Keefe Dep.) 192. He cannot now contradict that sworn testimony with an unsworn allegation to the contrary. The Court will thus grant summary judgment to the University on Count 4.

### C. Breach of Contract Claims Against ATRI (Counts 6 and 10)

In Counts 6 and 10, Plaintiff alleges two breach of contract claims against ATRI. First, Plaintiff alleges that it entered into a "verbal contract" or, alternatively, a contract "implied in fact and/or law" with ATRI by occupying space at the CCIC. ATRI apparently breached that contract by failing to offer Plaintiff "all the benefits offered by the CCIC to start-up businesses," and instead "consenting to its domination and control by Corning and [the University]." Second, Plaintiff alleges that ATRI violated the 2003 unsigned NDA between Plaintiff and the CCIC (now ATRI) by disclosing confidential information to third parties. The Court finds that both claims fail as a matter of law.

The statute of limitations for a breach of contract claim under New York[3] law is six years, and begins to run from the day the contract was breached. *See* 6 N.Y. C.P.L.R. § 214; *ABB Indus. Sys. v. Prime Tech.*, 120 F.3d 351, 360 (2d Cir. 1997). To establish a breach of contract claim, Plaintiff must show that: (1) the parties entered into a valid contract; (2) Defendant failed to perform his obligations under the contract; and (3) Plaintiff sustained damages as a result. *VisionChina Media Inc. v. S'holder Representative Servs., LLC*, N.Y.S. 2d 338, 345 (2013).

First, Plaintiff's claims based on the "verbal" or "implied" contract created by its CCIC tenancy are time-barred because they accrued no later than July 2004. Plaintiff's "timeline of interference" states that, in 2004, Plaintiff "learn[ed] that despite [its] repeated efforts to obtain grants . . . [Plaintiff is] denied [grants] but Corning receives $16 million approximately." Pl. Timeline. By July 2004, Plaintiff believed that Robert Ecklin, who "as director of [the CCIC] was responsible for helping companies," intended to "destroy [Plaintiff] and that "Ecklin personally and Corning as a whole ha[d] an intrinsic conflict of interest in running of new company/technology incubator centers" in that "[t]hey have no interest in fostering new business creation outside the confines of their own companies and personal balance sheets." *Id*. Even assuming that an implied contract was created merely by virtue of Plaintiff's CCIC tenancy, Plaintiff's breach of contract claims arising out of this "contract" had accrued by July 2004 – when, according to Plaintiff, the director of the CCIC was intent on "destroying" Plaintiff – and needed to

---

[3] Plaintiff concedes that New York law applies to Counts 6 and 10. ECF doc. 282, Pl.'s Opp Br. at 21.

be asserted no later than July 2010. Plaintiff's January 2011 action was filed too late to assert this claim.

Second, Plaintiff has failed to establish a breach of contract claim based on the 2003 NDA. As a preliminary matter, Plaintiff has not shown that a valid contract existed between the parties. ATRI has denied the existence of such an agreement, and Plaintiff has only provided a copy of an unsigned draft NDA dated June 12, 2003 and an unsupported assertion that the parties signed the NDA on an unspecified date. An unsigned NDA alone, without other objective evidence establishing that the parties intended to be bound, is not enforceable. *See 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir. 2011) (under New York law, "an unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound.") (internal quotations omitted).

But even if the unsigned NDA is a valid contract, Plaintiff has not demonstrated that ATRI breached that contract. The NDA requires ATRI to maintain confidentiality for a term of five years following "the last date [Plaintiff] discloses Confidential Information." O'Keefe Decl. Ex. A ("NDA"). "Confidential Information" is defined as "proprietary information which is related to [microwire] . . . for use in security and military applications." The NDA states that "Confidential Information disclosed orally shall be identified as such in writing with five days of disclosure." NDA at 2. ATRI contends that it did not disclose any Confidential Information to third parties. In response, Plaintiff generally asserts that "any information that [Plaintiff] provided to . . . . ATRI was protected by [the] confidentiality provisions" of the NDA, but does not identify what information it provided to ATRI.[4] Because Plaintiff has not described any work product that ATRI improperly disclosed to a third party, or provided any written identifications of Confidential Information as required by the NDA, summary judgment in favor of ATRI is warranted as to Counts 6 and 10. *See Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 407 (S.D.N.Y. 2015), *aff'd by Abdel-Karim v. Egyptair Holding Co.*, No. 15-2772-CV, 2016 WL 2848672 (2d Cir. May 16, 2016) (granting summary judgment because Plaintiff "has not identified any breach of contract by the defendants").

### D. Misappropriation of Trade Secrets against the University and ATRI (Count 7)

In Count 7, Plaintiff alleges that: (1) ATRI misappropriated its trade secrets by sharing Plaintiff's business plan with Corning in 2002; and (2) the University misappropriated its trade secrets relating to microwire. These claims fail as a matter of law.

---

[4] To the extent that Plaintiff claims that a breach occurred when an ATRI board member shared a copy of Plaintiff's business plan with Corning, this incident occurred in 2002, and cannot reasonably be construed as covered by the NDA, dated June 2003.

The Court previously determined that New York law governs Plaintiff's misappropriation of trade secrets claims. *Demodulation, Inc. v. Applied DNA Sciences, Inc.*, No. 2:11-CV-00296, 2012 WL 6204172, at *13 (D.N.J. Dec. 12, 2012). Under New York law, a three-year statute of limitations applies to misappropriation claims. *Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1098 (3d Dep't 2007); *Demas v. Levitsky*, 291 A.D.2d 653, 658 (3d Dep't 2002). To succeed on a claim for misappropriation of trade secrets under New York law, Plaintiff must demonstrate that (i) "it possessed a trade secret," and (ii) the defendant "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 43–44 (2d Cir. 1999) (internal citation omitted).

ATRI argues that that Count 7 is time-barred as to ATRI because Plaintiff's only allegation against ATRI occurred in 2002. Plaintiff does not oppose this claim or otherwise present any argument against summary judgment; accordingly, the Court will grant summary judgment in favor of ATRI as to this Count.

The University argues that, even assuming that Plaintiff has properly identified trade secrets it provided to the University, and shown that the University had a duty not to use those secrets, Plaintiff has not presented any evidence that the University misappropriated those secrets. The Court agrees.

In support of summary judgment, the University points out that Dr. King, when asked for evidence that the University had misappropriated Plaintiff's trade secrets, testified that he did "not have anything that he could point to" or "think of." Bevelock Dec. Ex. H at 197:23-198:24. In its opposition brief, Plaintiff vaguely asserts that the University is "incorrect," and cites to "Exhibit B-3" appended to its brief, without further explanation. Exhibit B-3 consists of (what appears to be): (1) the first page of the search results on SUNY's website for articles about "microwire"; and (2) two 2003 draft reports "created by" University staff about "experimental results" on wireless experiments. ECF doc. 272-31. Plaintiff has not described the relationship between its misappropriation claim and these documents, beyond a conclusory claim that the documents "reveal some of Plaintiff's trade secrets." After conducting an independent analysis, the Court cannot detect how these documents bear any relationship to Plaintiff's misappropriation claim. Because Plaintiff has failed to set forth specific facts or affirmative evidence showing that there is a genuine issue for trial, *Anderson*, 477 U.S. at 256–57, summary judgment is granted as to this claim.

### E.  Unfair Competition against the University and ATRI (Count 8)

In Count 8, Plaintiff asserts a claim for unfair competition and tortious interference with prospective business relations against the University and ATRI. For the below reasons, the Court concludes that these claims are time-barred.

New York[5] law has a three-year statute of limitations for unfair competition and tortious inference with prospective business relations claims.  *See* N.Y. C.P.L.R. § 214(4); *Besicorp Ltd. v. Kahn,* 736 N.Y.S.2d 708 (3d Dep't 2002).  In New York, "a tort claim accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *Kant v. Seton Hall Univ.*, 422 F. App'x 186, 190 (3d Cir. 2011).

The gravamen of Plaintiff's unfair competition and tortious interference with prospective business relations claim is that ATRI and the University "took actions or conspired to take actions to prevent DEMOD from doing business with or getting grants or loans from third parties." SAC ¶ 103.  Specifically, Plaintiff alleges that Defendants actively diverted grants from Plaintiff to Corning and sought funding for Corning instead of Plaintiff.  Pl. Br. at 23.  Like Plaintiff's RICO claims, this claim accrued by June 2006, when Plaintiff sent its letter to several federal and state agencies requesting that they conduct a criminal investigation into Defendants' potential "conspiracy" to deprive Plaintiff of funding.  *See* Walsh Decl. Ex. L.  Accordingly, the applicable three-year statute of limitations had long run when Plaintiff brought suit in 2011.

### F.  Fraud Claim Against Corning and ATRI (Count 9)

In Count 9, Plaintiff alleges that: (1) in summer 2004, Robert Ecklin, in his position as a Corning and ATRI representative, fraudulently represented to Plaintiff that Corning had "no interest" in microwire technology, "when in fact [Corning] was at that very time involved in a joint development project for a microwire [radio-frequency identification] application"; and (2) in January and February 2005, Hatton falsely stated that Corning was not involved in any activity that would constitute a breach of the NDA with Plaintiff, when "Corning knew it was involved in [the microwire application]." SAC ¶ 107.  Summary judgment is warranted as to both claims.

Under New Jersey[6] law, the statute of limitations for fraud is six years, and a cause of action accrues when a plaintiff knows or should know of its existence.  *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (citing N.J.S.A. 2A:14-1).  A plaintiff claiming fraud must allege that a defendant (1) misrepresented a fact; (2) fraudulently; (3) intending to cause the plaintiff to rely thereon; (4) inducing such reliance; and (5) to plaintiff's injury.  *Averbach v. Rival Mfg. Co.*, 809 F. 2d 1016, 1019 (3d Cir. 1987).  If a party to whom representations are made nevertheless chooses to investigate the relevant state of facts for itself, "it will be deemed to have relied on [its] own investigation and will be charged with knowledge of whatever [it] could have discovered by a reasonable investigation." *DSK Enterprises, Inc. v. United Jersey Bank*, 189 N.J. Super. 242, 251 (App. Div. 1983).

---

[5] Defendants argue that New York law applies to this claim, and Plaintiff applies New York law to Count 8, apparently conceding this point.  Thus, the Court will apply New York law.

[6] The parties agree that New Jersey law applies to this claim.

Plaintiff's fraud claims against Corning and ATRI based on Ecklin's summer 2004 statements are time-barred. Plaintiff argues that its claims did not accrue until 2007, when Corning filed its microwire patent and Plaintiff incurred "damages." Not so. Plaintiff's claims accrued on January 9, 2005, when Plaintiff sent a letter to Corning maintaining that Corning had misappropriated its microwire technology in violation of the parties' NDA. According to Plaintiff's own "timeline of interference," this letter "spell[ed] out that Ecklin did damage to [Plaintiff's] efforts and that [Corning] is in violation of [Plaintiff]'s patents." Walsh Ex. C. Because the record conclusively establishes that Plaintiff knew of its fraud claims by January 9, 2005, and had allegedly sustained damages by this date, but did not file this action until January 18, 2011, these claims are time-barred.

With respect to Hatton's 2005 statements, even assuming that these statements constitute intentionally fraudulent misrepresentations, Plaintiff has met its burden to show that it reasonably relied on these statements. As Plaintiff's own "timelines" demonstrate, it has been conducting an independent investigation into Corning's actions since October 2004, and, since at least January 9, 2005, Plaintiff has maintained that Corning was in breach of the parties' NDA. In fact, in response to Hatton's January 2005 letter, Plaintiff sent back an email "clarifying" that Corning's ongoing development of glass-coated wire "violates our NDA" and that Plaintiff has "been hurt by [Corning's] actions." Given Plaintiff's comprehensive independent investigation into Corning's actions, and its unwavering insistence since 2005 that Corning violated the NDA, the Court finds Plaintiff's self-serving claim that it reasonably relied on Hatton's statement insufficient to withstand summary judgment. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002); *see also Golden v. Nw. Mut. Life Ins. Co.*, 229 N.J. Super. 405, 415 (App. Div. 1988) ("A false representation made to a person who knows it to be false is not in legal estimation a fraud.").

Finally, in its opposition to ATRI's motion for summary judgment, Plaintiff contends – for the first time – that its fraud claim against ATRI is based on ATRI's failure to help Plaintiff obtain funding. But Plaintiff cannot amend its fraud claim against ATRI in its brief in opposition to summary judgment. *See Taylor v. Sanders*, 536 F. App'x 200, 203 (3d Cir. 2013) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."). Accordingly, the Court will not consider this claim. *See Holland v. Simon Prop. Grp., Inc.*, 495 F. App'x 270, 273 (3d Cir. 2012) ("The District Court correctly declined to consider claims . . . asserted for the first time in [Plaintiff's] summary judgment opposition brief.") (internal citations omitted). Summary judgment is therefore granted as to Count 9.

### G. Plaintiff's Motion for Stay of Proceedings and to Withdraw as Counsel

Since Plaintiff's Complaint is dismissed, and the case will be closed, Plaintiff's counsel's motion to stay proceedings and withdraw as counsel is **DENIED as moot**. In doing so, the Court notes that this motion was filed more than five months after briefing concluded.

### IV. CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are **GRANTED** and the action is **DISMISSED**. Plaintiff's counsel's motion to stay proceedings and withdraw as counsel is **DENIED as moot**. An appropriate order follows.


                    /s/ William J. Martini
                    **WILLIAM J. MARTINI, U.S.D.J.**

**Date: August 24, 2016**